230 F.2d 683
 Rose SRYBNIK, Simon Srybnik, Louis D. Srybnik, Julius B. Srybnik and Sylvia Shernoff, as Executors and Trustees under the Last Will and Testament of Aaron G. Srybnik, Plaintiffs-Appellees and Appellants,
v.
Israel EPSTEIN, Defendant-Appellant and Appellee.
 No. 203.
 Docket 23845.
 United States Court of Appeals Second Circuit.
 Argued January 10, 1956.
 Decided March 13, 1956.
 
 Seymour Stone, New York City, for plaintiffs-appellees and appellants.
 Richard J. Stull, New York City (J. Lewis Ash, New York City, of counsel on the brief), for defendant-appellant and appellee.
 Before CLARK, Chief Judge, and FRANK and LUMBARD, Circuit Judges.
 LUMBARD, Circuit Judge.
 
 
 1
 These are cross-appeals by plaintiffs from a jury verdict against them and by the defendant from a jury verdict against him on his counter-claim. Aaron Srybnik brought suit in the New York State Supreme Court to recover a $3,000 deposit he paid to the defendant Israel Epstein and $850 he advanced for insurance of a shipment of steel. As there was diversity of citizenship Epstein removed the case to the District Court and counter-claimed alleging breach of contract by Srybnik and seeking judgment against him for $123,500.
 
 
 2
 The claims arise from a written agreement signed by Srybnik and Epstein on November 28, 1950 "for the purchase of approximately 1,500 tons of certain steel items, consisting of plates, rounds, tubes and flats." Epstein undertook to import this steel from Europe "free and clear of duty and any and all governmental restrictions, encumbrances and entanglements." Epstein was to present a "clean Bill of Lading" to Srybnik. The steel was to be delivered to 140 — 53rd Street, Brooklyn, Srybnik's office and warehouse "where it will be subject to inspection by Mr. Srybnik before the deal is consummated."
 
 
 3
 Srybnik agreed to pay Epstein a deposit of $3,000 and the contract provided that pursuant to "satisfactory inspection of the steel by Mr. Srybnik" at the Brooklyn address that one half of the total cost, less the $3,000 deposit, was to be paid to Epstein by Srybnik. If the inspection showed that the steel was not satisfactory the $3,000 deposit was to be returned.
 
 
 4
 The contract provided that in no event was the cost of the steel, including all necessary attendant expenses, to exceed the price of $75 per ton, plus necessary customs duty. The price per ton was to be certified by Epstein "by original contract between Mr. Epstein and the vendors of the above-mentioned steel items."
 
 
 5
 Srybnik paid Epstein the $3,000 deposit as provided in the contract. Srybnik's company engaged shipping space for the steel and paid out $850 for insurance following talks with Epstein. The boat carrying the steel from Trieste arrived in New York February 28, 1951. One or two evenings before that there was a conference at Srybnik's office attended by Srybnik, Philip Rothenberg, Srybnik's office manager, Edwin O'Brien, a customs broker, and Epstein. Epstein exhibited a contract between himself and one Dr. Brande for 1,500 tons of steel at $75 per ton. Epstein said he had not paid for the steel nor had any shipping charges been paid. Epstein testified that he did not pay Brande for the steel until 1954.
 
 
 6
 At the conference prior to arrival of the steel, it was suggested that the customs entry be made in the name of Harry B. Novey, Srybnik's brother-in-law, who had a yard opposite Srybnik's place of business. Epstein agreed to this and endorsed the Bill of Lading and executed a document which stated that he had assigned the shipment to Novey.
 
 
 7
 After the steel was unloaded Novey inspected it at the pier and found it unsatisfactory. Some of the material he described as "cut-off pieces, short ends, there was bent and twisted material, it was rusty and pitted. Also there was a lot of railroad axles from which the wheels had been torched off with an acetylene torch." The cut-off pieces and short ends looked to him like a lot of scrap. Novey testified that Epstein was present at this inspection but Epstein denied this.
 
 
 8
 Novey thereupon reported to Simon Srybnik, Aaron Srybnik's brother, who then went to the pier himself. Simon Srybnik testified that his brother had taken ill and gone to Florida and had left him in charge of the deal. Simon Srybnik reported to his brother and it was decided to reject the shipment. Rothenberg subsequently reported this to Epstein.
 
 
 9
 Novey then arranged that the customs broker should change the customs papers to show Epstein as the owner. 273 tons of steel were classified as "round and end pieces for use as scrap" on the amended customs entry filed in July 1951. Epstein himself testified that approximately 300 tons were later sold as scrap.
 
 
 10
 Epstein alleges four principal errors, all of which we find to be without substance:
 
 
 11
 1. Epstein complains of the exclusion of five depositions which he offered to show the prices at which those who bought the steel from him had resold it. These prices were at best only remotely relevant to show the quality of the steel or its market price upon arrival in Brooklyn. In any event Epstein could not have been prejudiced by exclusion of the evidence. His own testimony was that the market price of the steel on arrival was $200 per ton. Abraham Rosenfeld, a witness for Epstein, testified that he offered Epstein $100 a ton for the whole lot around the middle of March, which offer Epstein refused. Even at the Rosenfeld figure Epstein had suffered no damage, as the overall cost, according to Epstein, was $87.50 per ton.
 
 
 12
 2. The defendant submitted requests to charge the jury that they might find that Srybnik and Epstein were engaged in a "joint venture." Whatever the agreement called for in the event of Srybnik's acceptance of the steel, a right to recover could arise only if Epstein showed that he had suffered damages. He showed no damage on either a joint venture or a contract theory since by his testimony and that of his witness, Rosenfeld, he could have sold the steel for a price substantially higher than its cost. His loss resulted from his own decision to hold the steel for a higher price after Srybnik had rejected it. Epstein was therefore in no way prejudiced by the charge given or the refusal to charge as requested.
 
 
 13
 3. The defendant claims error in various rulings of the trial judge. Principal of these was the Court's charge that Aaron Srybnik was not required to make a personal inspection of the steel but that he "had the right to have this inspection made either by himself or by somebody designated by him for that purpose." This instruction was correct. Srybnik was not an impartial arbiter nor was he especially qualified to make the inspection. The inspection was for his own protection and there is no reason why he should not have designated an agent to perform it for him. The Court properly charged: "To exercise his right of rejection, he must act with reason. To justify him in rejecting the shipment, you must find that as a reasonable man he reasonably reached the conclusion that the shipment did not conform with the representations in the contract and was not satisfactory for the purpose for which he had entered into the contract." So long as the buyer was held to this standard the seller was not prejudiced by the designation of an agent to inspect. None of the New York cases cited to us by Epstein require a different result. E. g., Dustan v. Mc Andrew, 1870, 44 N.Y. 72; Estes v. Curtiss Aeroplane & Motor Corp., 1920, 191 App.Div. 719, 182 N.Y.S. 25, affirmed 1922, 232 N.Y. 572, 134 N.E. 576; Hubbard v. Chapman, 1898, 34 App.Div. 252, 54 N.Y.S. 527, affirmed 1900, 165 N.Y. 609, 58 N.E. 1088.
 
 
 14
 4. Defendant complains of the District Court's failure to award him costs. 28 U.S.C.A. § 1920 and Rule 54 (d), Fed.Rules Civ.Proc. 28 U.S.C.A. leave the matter of costs to the discretion of the Court. United States v. Bowden, 10 Cir., 1950, 182 F.2d 251; Alameda v. Paraffine Companies, 9 Cir., 1948, 169 F.2d 408. In a case such as this where the defendant counter-claims for affirmative relief and neither party prevails on its claim, it is quite appropriate to deny costs to both parties, as was done in Magee v. McNany, D.C. W.D.Pa.1951, 11 F.R.D. 592.
 
 
 15
 Srybnik's executors complain that the jury's verdict which denied recovery to the plaintiffs is against the weight of the evidence and contend that a verdict should have been directed in their favor. Although they moved for a judgment n. o. v. after the verdict was rendered, they had not moved for a directed verdict at the close of the defendant's case. The question of the legal sufficiency of the evidence is therefore not open on appeal. Harriman v. Midland Steamship Line, Inc., 2 Cir., 1953, 208 F.2d 564. The plaintiff also moved that the verdict be set aside as against the weight of the evidence. The denial of this motion is, however, not appealable. Harriman v. Midland Steamship Line, Inc., supra. In any event there was much conflicting evidence on all issues of the case, which conflicts were for the jury to resolve. Although the verdict seems on the surface inconsistent, it may rationally have been based on a finding that neither side had sustained the burden of proof on its claim or on a finding that the defendant was in the right but had suffered no damages. A reading of the record supports the wisdom of this double Scotch verdict of "not proven" by either side. The record is replete with much equivocal, vague and unconvincing testimony on both sides. To deny both parties any relief under such circumstances is the proper prerogative of the jury.
 
 
 16
 The judgment is affirmed.