Robert P. KROPP, Appellant,

v.

Sylvester A. ZIEBARTH, a/k/a Silver A. Ziebarth, and Carol A. Ziebarth, husband and wife, and Cleon Striegel, Appellees.

No. 78–1182.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 19, 1978.

Decided July 5, 1979.

Rehearing Denied July 12, 1979.

**1350**

John R. Davidson, Davidson, Veeder, Baugh & Broeder, Billings, Mont., argued, for appellant; Fred E. Whisenand, McIntee & Whisenand, Williston, N. D., on brief.

Robert Edd Lee, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Mont., argued, for appellees; David L. Peterson, Wheeler, Wolf, Wefald & Peterson, Bismarck, N. D., on brief.

Before GIBSON, Chief Judge, and BRIGHT and STEPHENSON, Circuit Judges.

## ORDER GRANTING PETITION FOR REHEARING, WITHDRAWING PRIOR OPINION, AND SUBSTITUTING OPINION OF THE COURT.

Robert P. Kropp, in seeking a rehearing, contends essentially that the district court erred in admitting into evidence exhibits 51 and 92 of the Buyers (Sylvester Ziebarth, Carol Ziebarth, and Cleon Striegel), because the exhibits lack foundation and impermissibly reflect gross rather than net losses in value to Buyers stemming from Kropp's breach of contract. The exhibits in question illustrate the losses allegedly suffered by Buyers on the sale of the herd of exotic cattle bought from Kropp and, additionally, projected losses on the sale of that herd's 1973 calf crop as a result of Kropp's failure to deliver documents enabling Buyers to register the herd as exotic cattle. The exhibits also describe the amounts Buyers expended for the care and maintenance of the cattle and their progeny from November 8, 1972 (the date of delivery) to July 12, 1976 (the date the receiver took possession of the remaining cattle). In exhibit 51, Buyers add the loss in sales value and the cost of care and keep to demonstrate the total loss they allegedly sustained as a result of Kropp's breach of contract.

In response to Kropp's petition for rehearing, we have carefully reexamined the exhibits in question and now conclude that the exhibits contain excessive and duplicative items of damage. Accordingly, the petition for rehearing is granted, and the court withdraws its prior opinion dated February 28, 1979, and substitutes the attached opinion as the opinion in this case.

PER CURIAM.

Robert P. Kropp (Seller) appeals from the judgment and order of the district court,[1] following a jury verdict, dismissing his complaint and the counterclaim of the appellees, Sylvester Ziebarth, Carol Ziebarth, and Cleon Striegel (Buyers), and directing Kropp to pay Buyers $88,218.51 for attorney's fees and/or costs and expenses.[2] This action arose out of a contract for the sale of cattle between the aforementioned parties. Federal court jurisdiction rests upon diversity of citizenship and the requisite amount in controversy. The law of Montana, the state in which the parties agreed to performance of the contract, governs this controversy.

On appeal Kropp alleges the following incidents of error by the district court:

---

1. The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota.

2. The district court judgment also indicated that a mortgage Kropp had received as security interest in the cattle on a ranch in North Dakota owned by the Ziebarths was satisfied and directed that certain funds held in receivership from the sale of contract cattle be paid to Sylvester Ziebarth.

(1) failure to grant Kropp a directed verdict at the completion of Buyers' case;[3]

(2) permitting Buyers to prove their alleged damages with improper evidence;

(3) improperly instructing the jury on waiver of contractual provisions;

(4) construing the jury's verdict as requiring that receiver's deposit be paid to Buyers; and

(5) finding that under the contract terms and Montana law Buyers were entitled to recover costs, expenses, and attorney's fees.

We find no merit in Kropp's allegations numbered 1, 3, and 4. We agree in part with Kropp's claim concerning damages (item 2), and we remand the case to the district court with directions to enter a remittitur of $60,000 on the counterclaim, with the consent of Buyers, or grant a new trial.

We believe the trial court erred in its assessment of attorney's fees and costs (item 5), as the record discloses no reasonable basis for its order that Kropp pay attorney's fees. Moreover, in light of our order directing a remittitur or a new trial, costs, if assessed, must abide the final outcome of the action upon a new trial.

I. *Factual Background.*

In October 1972, Carol and Sylvester Ziebarth and Cleon Striegel purchased thirty-seven head of unregistered half-blood exotic cattle[4] from Robert Kropp of Montana for $30,000. Buyers accepted and transported these cattle to their North Dakota ranches by early November 1972. On November 8, 1972, Kropp contracted to sell Buyers 1,078 head of commercial and exotic cattle for $815,000. The contract provided that payments for the cattle would be made in the following manner: a $115,000 down payment and four annual installments of $204,337 from 1973–1976, which included annual interest of 6.5 percent on the unpaid principal balance. Kropp retained a security interest in the cattle and their progeny[5] and, to further secure the amount of the unpaid contract, received a second mortgage on the Ziebarth ranch. For the maintenance and care of the cattle while they remained on Kropp's land, Buyers agreed to pay Kropp $15,000 annually. The contract further provided that if the exotic cattle were not registered with respective exotic breed associations at the time of sale, Kropp would do everything necessary to register them.

Buyers received all the livestock on November 8, 1972, and they immediately commenced transporting some of the cattle from the Kropp ranch in Montana to North Dakota, where the contract cattle were commingled with other livestock owned by Buyers. By May 1973, Buyers had removed all of the contract cattle to North Dakota.

Buyers purchased the exotic cattle for use as breeding stock in an upgrading program designed to produce a domestic herd of foreign breed cattle. The upgrading program consists of artificially inseminating domestic cows with the bull semen of exotic breeds, then repeating the insemination process with the ensuing progeny until, after four generations, the domestic breeder develops a "purebreed" exotic strain for registration purposes. As the registerability of the exotic animals with breed associations depends on the quality of the breeder's records, meticulous records preserving each animal's pedigree are essential to the exotic upgrading program.

Kropp delivered all breeding and calving records to Buyers by March 1973, but Buyers encountered difficulty in matching the cattle with the records. Believing the records to be inadequate, Buyers undertook a blood-typing program to facilitate the identification and registration of the cattle. On August 5, 1973, Kropp and the Buyers entered into an oral agreement—never re-

---

3. In a postjudgment motion, Kropp sought a judgment n.o.v. or, in the alternative, a new trial for the amount remaining due under the contract.

4. The exotic cattle referred to in the text of the opinion include several breeds of non-native

cattle, specifically, Limousin, Simmental and Maine-Anjou.

5. According to the terms of the contract, Kropp waived his security interest with respect to the first 400 head of cattle sold by Buyers which had the approximate total value of $150,000.

duced to writing—that Kropp would pay the expenses for animals that had to be bled for registration purposes.

Realizing the inadequacy of Kropp's registration papers, Buyers began selling the cattle in February 1973. By 1976 Buyers had sold most of the contract cattle. None of the sales were made with Kropp's prior approval, and Buyers retained all of the sales proceeds. After a down payment and a first installment payment, Buyers refused to make further payments on their contract with Kropp.

In October 1975, Kropp filed this action to recover the balance due under the contract, $655,100, and his costs for the care and maintenance of the cattle while they remained on his property. He also sought foreclosure of his liens on the cattle and on the Ziebarth ranch. Buyers answered that Kropp breached the contract because he failed to do everything necessary to register the cattle and because not all of the cattle were qualified for registration as exotic breeds as warranted. Buyers filed a counterclaim for $1.5 million in damages. In their counterclaim, Buyers alleged that, due to Kropp's breach, they lost sales during the peak exotic cattle market and were forced to accept lower prices for the cattle because of suspect registration and delays in registration. The district court appointed a receiver in 1976 who sold the remaining cattle in Buyers' possession and deposited the resulting fund with the court.

Following an order by the district court on October 15, 1976, dismissing Kropp's complaint pursuant to Fed.R.Civ.P. 37(b)(2) for prolonged "thwarting" of the discovery process, this court set aside the judgment dismissing the complaint and remanded the case to the district court for trial. *Kropp v. Ziebarth*, 557 F.2d 142 (8th Cir. 1977). At the conclusion of trial, the jury returned a verdict exactly offsetting the parties' claims against each other and dismissing the complaint and the counterclaim. The district court denied Kropp's motion for

judgment n.o.v. or for a new trial and entered the following order and judgment:

(1) Kropp's complaint and Buyers' counterclaim are dismissed;

(2) The real estate mortgage held by Kropp against the North Dakota ranch of Buyers Carol and Sylvester Ziebarth is satisfied;

(3) The clerk withdraw the monies on passbook deposit and pay the total sum to Sylvester Ziebarth; and

(4) Kropp pay Buyers the sum of $88,-218.51 for attorney's fees and/or costs and expenses.

From this judgment, Kropp appeals.

## II. *Issues on Appeal.*

### A. *Directed Verdict.*

In determining whether a verdict should be directed, we utilize the same standard applied by the trial court in originally passing on the motion: was the evidence sufficient to create an issue of fact for the jury? 9 Wright & Miller, *Federal Practice and Procedure:* Civil § 2524 at 541, § 2536 at 595 (1971). In answering this question of law, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the party opposing the motion. In addition, the evidence must not be susceptible to reasonable inferences sustaining the position of the nonmoving party, that is, a directed verdict is inappropriate where the evidence supports more than one reasonable conclusion. In the instant case, the district court denied Kropp's motion for a directed verdict and placed the issues of the amount owed to Kropp under the contract and Buyers' counterclaim simultaneously before the jury.

Kropp claims that, because they admitted acceptance of the cattle, Buyers are bound as a matter of law to pay the remainder of the contract price due on the livestock,[6] and he was therefore entitled to a directed verdict on his contract claim. Kropp further argues that the issue of Buy-

---

**6.** In an amended complaint Kropp reduced his claim by $52,000 for the variance in the number of specific exotic cattle Buyers contend they did not receive. He also reduced by some

$18,500 his claim for the care of the cattle while they remained on his premises. The amended complaint, then, prays for a judgment of $572,474.60, plus attorney's fees.

ers' set-off or damages caused by any breach of warranty should have been submitted to the jury separately from and subsequently to his contract claim. Buyers, on the other hand, urge that because of the many controverted issues of fact surrounding their acceptance of the cattle, the trial court did not err in denying the motion for a directed verdict.

We think the trial court did not err in refusing a directed verdict. Whether the contract cattle were as represented to Buyers constituted a question of fact for the jury, as did Kropp's claim for the cost of caring for the cattle. Furthermore, the court's instructions made it clear that the jury was required to consider how much, if anything, Kropp was entitled to receive and how much, if anything, Buyers were entitled to receive, and Kropp, apart from claiming entitlement to a directed verdict, offered no objection to the form of verdict ultimately submitted to the jury.

### B. *Damages.*

█ Kropp alleges the district court erred in permitting Buyers to introduce evidence to prove damages resulting from his breach of contract that was without proper foundation, uncertain and contrary to specific contractual terms. We agree in part with Kropp's claims for the reasons set forth below.

### 1. *Damage Evidence.*

Kropp challenges Buyers' exhibits 34, 51, and 92 as lacking proper foundation[7] and maintains that their introduction into evidence constituted prejudicial error.

Among his myriad lack of foundation arguments, Kropp contends that the three exhibits (1) fail to differentiate costs for the maintenance of contract cattle from similar costs for other cattle possessed by Buyers which were commingled with the contract cattle; (2) over-assess the damages caused by the breach, charging Kropp both with the loss in value of the cattle due to registration problems and with the cost of caring for the cattle; (3) are not supported by Buyers' tax returns; (4) fail to show the number of sales, if any, voided or delayed because of the lack of proper registration papers; (5) fail to show the commercial value of the cattle, notwithstanding the fact that some of the animals could not be characterized as exotic; (6) overcharge for the care and maintenance actually provided; and (7) make use of extraordinarily high trade publication values for the exotic contract cattle and 1973 calves instead of values based on Buyers' own sales.[8]

Claiming that their evidence possesses certainty[9] and proper foundation, Buyers respond that their damage calculations rely partly on values based on Buyers' own sales and partly on sales values used in the market, as accurately reflected by various trade

---

7. Exhibit 34 itemizes the costs incurred by Buyers in keeping the contract cattle and is based on costs, receipts, and documents kept by Ziebarth in the course of his managing the cattle. Exhibit 51, a summary based on exhibit 34, shows the proceeds from the sale of some exotic Simmental contract cattle and projects what the value of the 1973 progeny would have been had the mother cows been properly registered. It also includes the cost for care and maintenance of the contract cattle. Exhibit 92 individualizes the alleged damages sustained by Buyers due to Kropp's breach into the following main categories: loss in value of exotic cattle and loss from caring for cattle because of sales problems due to registration difficulties; loss caused by diminished value of 1973 calf crop because contract cattle failed to fulfill the warranty of the November 1972 agreement; and cost of care for the 1973 calves, which if

not for registration problems, would have been sold.

8. Kropp contends that Buyers' damage figures are uncertain in that they are not based on any viable market, improperly include lost profits on the 1973 calf crop, and are based on the speculative loss of a "boom" market in exotic cattle. He also repeats points alleged in his lack of foundation claim, *i.e.*, the figures fail to distinguish between the November 1972 contract cattle and other cattle, are based on the highest trade publication values listed and include the cost of care for both conforming and nonconforming cattle under the contract.

9. To be recoverable for breach of contract, damages must be "clearly ascertainable." *See* Mont.Rev.Codes Ann. § 17–302 (1964); *Lovely v. Burroughs Corp.*, 165 Mont. 209, 527 P.2d 557 (1974).

publications. The evidence submitted to the jury also included an inventory of the cattle in question (exhibits 30, 35) and the registration papers Kropp had delivered to Buyers. In addition, Buyers presented the testimony of experienced cattle buyers concerning market values and the boom market in exotic cattle.

The district court instructed the jury that the measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of goods accepted and the value they would have had if they would have been as warranted, unless special circumstances show proximate damage of a different amount." The court then explained the special circumstances relevant to the damage determination in this case.[10] The district court noted that the customary practice of the cattle-breeding trade allowed Kropp up to one year to supply Buyers with proper registration papers for the exotic cattle.

According to the exhibits and relevant testimony, Buyers sought to hold Kropp responsible not only for the loss in sales value because the cattle were not as warranted, but also for the cost of care of the cattle far beyond the ordinary period under which a buyer ought to have realized contract compliance would not be forthcoming.[11] Buyers cannot interminably justify taxing damages against Kropp for care and keep of the cattle with the argument that Buyers were simply attempting to mitigate damages by postponing sale of the cattle so that Kropp would have additional time to supply the registration papers.[12]

Although we believe Buyers' damage computation was highly excessive and may well have confused the jury, the nature of the verdict prevents us from precisely determining to what extent the jury may have discounted the inflated figures. Nonetheless, it appears clear that the jury must have been improperly influenced, to some degree, by the introduction of the extended cost of care expenditures and the November 1972–November 1973 cost of care figures into evidence as part of Buyers' damage package.[13] In light of the unreasonable cost of care figures appearing on Buyers' exhibits and presented to the jury, it would be a denial of justice to permit the verdict to stand.

10. The court gave the following instruction to the jury concerning those special circumstances:

1. The fact that the goods were cows bred to produce a higher percentage exotic calf and that said calf would not be weaned from the cow until approximately one year after the date of acceptance.

2. The fact that said cows were not readily merchantable without a registration certificate, and said certificates of registration were not instantly available, but rather the custom of the trade at the time provided for a delay of as much as one year in the delivery of registration papers.

3. The provisions of the contract provided that buyers would be able to maintain certain of the cattle on the premises of the seller until approximately one year after the acceptance of the goods.

In a proper case, and it is for you the jury to determine whether or not this is a proper case, the buyer may recover incidental and consequential damages in addition to the damages for breach of warranty. Such incidental damages may include any other reasonable expense incident to the delay in performance or other breach by the seller. Consequential damages resulting from the seller's breach include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented.

11. Buyers seek recovery for monies expended for the care and maintenance of the cattle and their progeny from the date of delivery until the receiver took control of the remaining cattle nearly four years later.

12. We note that if the cattle as warranted had been delivered on the contract date, Buyers, at their cost, would have had to care for the cattle from the date of their acceptance to the time— October or November 1973—when the 1973 calves could be weaned from the cows. Consequently, we fail to see why Buyers should not absorb the November 1972–November 1973 cost of care for the basic exotic herd, even though they were not as warranted, in light of the custom of the trade providing for "a delay of * * * one year in the delivery of registration papers." Whether or not Kropp breached the contract, Buyers, having decided to keep the herd and to sue for breach of warranty, incurred the obligation to pay for the care of the herd during that one year period.

13. See note 11 supra.

In his amended complaint, Kropp requested $572,474.60 as the balance due under the installment contract with Buyers, and Buyers counterclaimed for $1.5 million in damages due to Kropp's breach of contract. The jury determined that neither Kropp nor Buyers were entitled to recover from the other. However, as we previously observed, the jury must have been improperly influenced by the unreasonable and duplicative cost of care figures represented in Buyers' exhibits. Consequently, we believe the jury's verdict on Buyers' counterclaim is excessive. In light of the case's complexity, the already large record, and the length of time that has transpired since the events in question, we hesitate to order a new trial without an option for a remittitur on the offsetting counterclaim. We suggest that the verdict on the counterclaim be reduced by $60,000, our estimate of the effect on the verdict of the inflated and duplicative damage figures.

■ Accordingly, we remand the case to the district court with directions to enter, with the consent of Buyers, a remittitur on the counterclaim of $60,000, attorney's fees of $9,000,[14] and no costs to either party. The net effect of the remittitur would be to give Kropp an award of $69,000. Such judgment on remittitur will bear interest only from the date of its entry. If Buyers refuse to accept the reduced counterclaim, the district court is directed to grant a new trial in this case.[15]

**2. Warranties.**

Kropp alleges the trial court erred in instructing the jury that the contract contained an implied warranty that the exotic cattle were fit for sales purposes. He claims that the installment contract and security agreement of November 8, 1972, warranted only the registerability of the exotic cattle with respective breed associations.[16] Kropp argues that the contract's language excludes any implied warranties concerning the 1973 progeny of the 1972 contract cattle, and, therefore, he should not be held liable for Buyers' alleged loss in profits on the projected 1973 calf crop due to registration difficulties with the exotic mother cows.

■ Kropp raises his objections to the warranty instructions for the first time in this court. That objection comes too late to preserve the alleged error on appeal. *See Boeing Airplane Co. v. O'Malley*, 329 F.2d 585, 598 (8th Cir. 1964). But even if we construe Kropp's "original objection to the instructions" as an effective objection to warranty instructions numbered 10 and 11, we find no merit to Kropp's allegations on this matter.

The record discloses that Buyer purchased the cattle for use as breeding stock in a domestic upgrading program of exotic animals. Kropp explicitly warranted that the livestock would be registrable and "clean and merchantable."[17] In addition,

---

**14.** The contract between Kropp and Buyers stated, in pertinent part, that "Buyers shall pay to [Kropp] reasonable attorneys' fees not exceeding fifteen percent (15%) of the amount due and payable under this contract[.]" The $9,000 awarded as attorney's fees constitutes 15% of the $60,000 granted Kropp on remittitur.

**15.** Because the questions of liability and the extent of damages are intertwined, we must order a new trial on all issues, not just damages.

**16.** The contract provided in pertinent part:
Buyers accept said property without any warranties or representations of any kind, except as otherwise stated in *ADDITIONAL COVENANTS OF BUYERS AND SELLER* below. No agreement, promise or warranty not expressed herein and no defect in condi-

tion or quality of the property shall bind or afford a defense against any assignee hereof or other holder hereof.

Relevant "additional covenants" include the following provisions: "Seller * * * warrants and agrees said 'exotic' breeds shall qualify for registration under the rules and regulations of the respective associations"; "Seller shall * * * do any and all things necessary to register said breeds;" and "Seller warrants that all of said property is, or shall be at the time of possession of said property is given to Buyers, clean and merchantable[.]"

**17.** It is reasonable to assume that in entering the agreement both parties intended the exotic cattle to be fit for breeding in an upgrading program for the purpose of developing higher percentage exotic calves. Kropp's breach of the warranty of registerability allegedly caused

the contract stated that "Buyers intend to use the remaining [cattle] for breeding purposes and the parties understand such usage will of necessity result in further sales of said property in the normal course of such breeding[.]" In other words, Buyers' sales were contemplated even though the cattle were purchased for a breeding program.

In instructions numbered 10 and 11, the district court defined the contrary warranty in language borrowed from Mont.Rev.Codes Ann. §§ 87A–2–314, 315 (1964). The district court committed no error in instructing the jury that the contract called both for the cattle to be registerable and to be fit for the particular purpose of breeding for higher percentage exotic calves in an upgrading program. The district court's suggestion in its instructions that Buyers' sales could be anticipated and that the exotic cattle should be fit for such sales is a reasonable construction of the terms of the agreement.

### C. Waiver.

The installment contract and security agreement provide that "[a]ll waivers under this contract and agreement must be in writing." On August 5, 1973, after Buyers realized the registration papers for the con-

tract cattle were not forthcoming as quickly as they had hoped, the parties orally agreed that the unregistered exotic livestock would be bled for identification purposes, with Kropp absorbing the costs of the program. Kropp suggests that one purpose of the oral agreement, as evidenced by Buyer Ziebarth's acceptance of Kropp's payment for the blood-typing program, was Buyers' waiver of their claim that Kropp breached his contractual duty to prepare registration certificates.

Mont.Rev.Codes Ann. §§ 87A–2–208, 209 (1964) provide that "any course of performance accepted or acquiesced in" is relevant to the interpretation of a contract's meaning [18] and that a contract provision requiring that all contract modifications be in writing can be waived.[19]

Kropp contends that the trial court's instruction number 9, which explains that a "signed agreement which excludes modification * * * except by a signed writing cannot be modified * * * by oral agreement or otherwise," is contrary to Montana law and constitutes prejudicial error.

■ The record reveals that Kropp did not object to instruction number 9 and failed to raise it as error in posttrial motions.[20] Kropp contends, however, that his

---

a number of misbreedings. The 1973 calves, intended to be the first step in developing a purebred strain of exotic cattle, were much less "pure" in terms of foreign blood than expected, because of Kropp's breach of warranty with respect to the mother cows.

18. Section 87A–2–208 (1964) provides:
Course of performance or practical construction. (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course or performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.
(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 87A–1–205).
(3) Subject to the provisions of the next section on modification and waiver, such

course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

19. The applicable portion of § 87A–2–209 provides:
Modification, rescission and waiver. (1) An agreement modifying a contract within this chapter needs no consideration to be binding.
(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.
* * * * * *
(4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.

20. Although Kropp contends the discussion at volume VII of the transcript, pp. 183–94, fully advised the court of Seller's position regarding instruction no. 9, that transcript excerpt concerns the admissibility of a portion of a deposi-

proposed instruction number 16, denied by the district court, was tantamount to an objection to instruction number 9. We do not agree, and we hold that Kropp has not preserved his objection on this matter.

█ In any event, the giving of instruction number 9 in the context of the entire case was not prejudicial to Kropp. The effect of the alleged oral agreement was to allow Kropp an opportunity to mitigate the damages attributable to his breach. The record does not indicate that Buyers waived any of their rights under the contract by the foregoing oral arrangement. As already indicated, the issues concerning damages, including the extent of Kropp's mitigation, were properly presented to the jury.

### D. Receiver's Deposit.

█ A court-appointed receiver took control of the remaining contract cattle in Buyers' possession on July 12, 1976, and he eventually sold the cattle and deposited the resulting fund of $33,462.75 with the court. After the jury returned its verdict giving Buyers a complete set-off against the unpaid balance on the contract, the district court awarded the deposit to the Buyers.[21]

Kropp challenges the district court's disposition of the deposit, asserting (1) that he retained a security interest in the cattle and therefore possessed an interest in the proceeds of the receiver's sale of the cattle, and (2) that he was denied a jury trial on the issue of entitlement to the deposit because the question of whether the money was his as payment due on the contract had not been submitted to the jury.[22]

We deem the district court's decision to give Buyers the deposit justifiably follows from the jury's finding that neither Buyers nor Kropp were entitled to recover any money from the other party. The verdict

extinguished any security interest Kropp retained in the cattle and terminated any obligations between the parties. At the time of the receiver's sale the cattle were the property of Buyers, and, therefore, the district court did not err in presenting the deposit to Buyers.[23]

### E. Attorney's Fees, Costs, and Expenses.[24]

The installment contract and security agreement provides that:

[S]hould [Kropp] refer this contract for collection to an attorney not a salaried employee of [Kropp], Buyers shall pay to [Kropp] reasonable attorneys' fees not exceeding fifteen percent (15%) of the amount due and payable under this contract and [Kropp] shall also be entitled to recover court costs and actual and reasonable out-of-pocket expenses incurred in connection with any delinquency.

█ The pertinent Montana statute provides that

in the event the party having that right shall bring an action upon the contract or obligation, then in any action on such contract or obligation all parties to the contract or obligation shall be deemed to have the same right to recover attorney fees, and the prevailing party in any such action, whether by virtue of the express contractual rights, or by virtue of this act, shall be entitled to recover his reasonable attorney fees from the losing party or parties. [Mont.Rev.Codes Ann. § 93–8601.1 (1964).]

The prevailing party in a suit is entitled to reasonable attorney's fees, and the right to attorney's fees delineated in a contract is reciprocal under governing Montana law.

tion dealing with the oral agreement, and does not constitute an effective objection to the instruction.

**21.** Because of accumulated interest, the receiver's deposit at the time of withdrawal had increased to $34,206.63.

**22.** Although the specific question of who should receive the deposit was not submitted, the jury heard testimony about the status and

amount of the fund, and the receiver testified concerning the fund's origin.

**23.** This deposit, if still in existence, should stand as partial security for the judgment entered on remittitur.

**24.** We discuss these issues only in the context of a judgment which dismisses both the complaint and the counterclaim.

The jury found that neither party was entitled to recover from the other. The district court apparently construed the verdict to mean that Buyers had established on their counterclaim an entitlement to an amount equal to the remainder of the price due under the contract. Without further analysis, the court declared Buyers the "prevailing party" and directed Kropp to pay them $88,218.51 for attorney's fees and/or costs and expenses.[25]

The record does not justify any determination that Buyers, under the contract and Montana law, should be deemed the "prevailing party." The contract authorizes the prevailing party to receive "fees not exceeding fifteen percent (15%) of the amount due." However, no basis for calculating those fees exists here, because the jury determined that no amount was due to either party. But even before reaching the computation stage, we find no persuasive justification in the district court's reasoning or clear support in Montana case law for the court's view that only Buyers prevailed in this case. Depending on one's perspective, both parties either successfully fended off large claims or established their entitlement to large claims negating each other. Buyers have not shown themselves to be entitled to attorney's fees and costs under the contract, and the attorney fee part of the district court's judgment must be set aside.[26]

In the event the case is tried anew, the matter of costs ultimately will be determined under Fed.R.Civ.P. 54(d). That subsection provides for allowance of costs "to the prevailing party unless the court otherwise directs." On the present judgment, we set aside the district court's determination of costs.[27]

Accordingly, we vacate the awards of attorney's fees and costs, reverse the judgment of the district court, and remand for further proceedings consistent with this opinion.

---

**25.** The parties stipulated that the court should determine the issue of attorney's fees.

**26.** The remittitur determination to award Kropp $60,000, with the consent of the Buyers, carries with it a $9,000 award of attorney's fees in favor of Kropp. *See* note 12 *supra*.

**27.** We note that the district court's discretion to allocate costs is not to be exercised arbitrarily. *See Campania Pelineon De Navegacion, S.A. v. Texas Petroleum Co.*, 540 F.2d 53 (2d Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). In addition, when a defendant counterclaims for affirmative relief and neither party prevails on its claim, it is quite appropriate to deny costs to both parties. *Srybnik v. Epstein*, 230 F.2d 683 (2d Cir. 1956).