**SUPERTURF, INC., Appellant,**

v.

**MONSANTO COMPANY, Appellee.**

**No. 80–1484.**

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1981.

Decided Oct. 2, 1981.

Deming E. Sherman, Patricia A. S. Zesk, Edwards & Angell, Providence, R. I., Joseph L. Alioto, argued, San Francisco, Cal., for appellant SuperTurf, Inc.; Guilfoil, Symington, Petzall & Shoemake, St. Louis, Mo., on brief.

Fred H. Bartllit, Jr., argued, David E. Springer, Susan M. Meyer, Emily Nicklin, Kirkland & Ellis, Chicago, Ill., William F. Rogers, Richard A. Ringhofer, St. Louis, Mo., for appellee Monsanto Co.

Before HEANEY, STEPHENSON and McMILLIAN, Circuit Judges.

HEANEY, Circuit Judge.

SuperTurf, Inc., appeals from a judgment entered against it in its suit against Monsanto Company. We affirm as to the Sherman Act claims, reverse as to one state law claim and remand to the district court for further proceedings consistent with this opinion.

## I

## INTRODUCTION

SuperTurf, Inc., is a Texas corporation that sells and installs artificial turf athletic surfaces called "SuperTurf." The playing surface consists of green polypropylene fibers tufted into a backing which, in turn, is adhered to a shock absorbing pad. The fibers, backing and pad are purchased by SuperTurf from various manufacturers. The entire product is installed over an asphalt surface.

N. William Paschal, principal officer and owner of SuperTurf, entered the artificial turf business in 1975 with an installation at Cameron University in Lawton, Oklahoma. SuperTurf made two stadia installations in 1976, four in 1977, seven in 1978 and six in 1979.

Monsanto, a multi-national corporation headquartered in St. Louis, Missouri, was the first manufacturer and seller of synthetic turf. Monsanto's "AstroTurf," sold through its Recreational Products Division,

is composed of green nylon fiber woven into a backing and adhered to a shock-absorbing pad. Monsanto manufactures only the fiber. Monsanto installs AstroTurf through a subsidiary, Sport Install, Inc. Its first installation was made in 1966 at the Houston Astrodome.

SuperTurf brought suit in 1978 alleging that Monsanto had monopolized, attempted to monopolize and conspired to monopolize the market for the sale and installation of artificial turf in violation of section 2 of the Sherman Act.[1] SuperTurf's complaint also set forth a pendant state law claim for tortious interference with its advantageous business relations. A six-week trial was conducted on SuperTurf's claims in March–April, 1980. At the close of the trial, the court forced SuperTurf to elect between its antitrust and common law tort claims. Only the antitrust claims were given to the jury. SuperTurf moved for a directed verdict on the question of liability at the close of its case, and again at the close of all the evidence. The court reserved a ruling on this motion and on the defendant's directed verdict motion. The jury returned a general verdict for Monsanto. The district court denied SuperTurf's motion for judgment n.o.v. and for a new trial.

## II

### SHERMAN ACT CLAIMS

SuperTurf's initial argument is that the trial court erred in denying its motion for a directed verdict on the question of Monsanto's liability under section 2 of the Sherman Act. SuperTurf apparently would have us reverse the trial court's denial of judgment n. o. v. and order that judgment be entered in favor of SuperTurf, leaving the question

of the extent of SuperTurf's damages to further proceedings. We decline to do so.

Our review of the trial court's disposition of SuperTurf's directed verdict and j. n. o. v. motions is governed by the same standard applied by the trial court in originally passing on the motions. See *Kropp v. Ziebarth*, 601 F.2d 1348, 1352 (8th Cir. 1979). The evidence and all reasonable inferences therefrom must be viewed in the light most favorable to Monsanto, the party opposing the motions. A directed verdict or judgment n. o. v. is inappropriate where the evidence supports more than one reasonable conclusion. *Id.*

### Monopolization

The claim most seriously pressed by SuperTurf at trial was that Monsanto monopolized the market for the sale and installation of artificial turf. As the Supreme Court wrote in *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966):

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

SuperTurf's threshold task at trial was to delineate the relevant product market.[2] A relevant product market is composed of "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1955). Monsanto clearly dominates the artificial turf market;[3] the rele-

---

1. 15 U.S.C. § 2 provides in pertinent part:

 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony * * *.

 SuperTurf additionally charged that Monsanto combined and conspired to restrain trade in violation of section 1 of the Sherman Act. Su-

perTurf does not challenge the jury's rejection of its section 1 claim.

2. The parties have stipulated that the relevant geographic market is North America.

3. The plaintiff adduced evidence at trial showing that Monsanto's share of the artificial turf market was 79% in 1975, 81% in 1976 and 1977, 76% in 1978 and approximately 75% in 1979.

vant market is delineated to determine whether "the ongoing competition from other products guards against the ability of the dominant entity to increase prices and makes exclusionary tactics by such a party fruitless, impossible or unbearably expensive." *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20, 26 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

In determining whether two "products" are in the same market, it is important to consider the cross-elasticity of demand between the products, *i. e.*, whether consumers will shift from one product to the other in response to changes in their relative costs. *See United States v. Empire Gas Corp.*, 537 F.2d 296, 303 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). Some of Monsanto's witnesses did conjecture that a reduction in the price of artificial turf might encourage institutions to replace their natural grass surfaces with artificial turf. Even if this testimony were sufficient evidence of cross-elasticity to establish a broad product market, it is important to note that the Supreme Court has recognized that well-defined "submarkets" may exist for antitrust purposes within the outer boundaries of a product market. The Court has stated that

> [t]he boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

---

**4.** Monsanto's William Israel testified that an AstroTurf field can be used 3,000 hours a year, while a natural grass field can withstand only forty hours of use per year. Israel described instances where AstroTurf had been installed in stadiums that had previously been used only ten to fifteen times a year, primarily for varsity football games. Subsequent to the installation of the artificial turf, the stadiums were used extensively for physical education classes, intramural sports, varsity practice sessions and other recreational activities without leaving the varsity teams with a sea of dust or mud.

*Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). *See United States v. Grinnell Corp., supra*, 384 U.S. at 572, 86 S.Ct. at 1704.

In our view, "submarket" analysis is particularily appropriate where, as here, a manufactured product allegedly "competes" with an unlimited or virtually unlimited natural resource. *See United States v. Am. Technical Indus., Inc.*, 1974 Trade Cas. ¶ 74.873. There is considerable evidence of particularity to indicate that the artificial turf market is a submarket within the more broadly defined market for artificial turf and natural grass athletic surfaces.

Artificial turf athletic surfaces are peculiarly durable compared to natural grass surfaces, affording multiple extended usage in facilities where it is installed.[4] Production of the two "products" is obviously completely dissimilar. Artificial turf is made of polypropylene or nylon, and adhered to manufactured surfaces. Natural grass playing surfaces are "merely well-cultivated products of nature." *United States v. Am. Technical Indus., Inc., supra*, 1974 Trade Cas. at 95,873.

Although there is an overlap between customers of the artificial and the natural products, there is a group of customers for whom the artificial turf is the only realistic choice. Owners of domed stadiums are in this group, as are institutions in urban areas. In areas where additional land is unavailable or prohibitively expensive, institutions use artificial turf to afford multiple and extended usage of their existing facilities.[5]

---

**5.** "[T]he existence of competition between two product lines does not alone preclude market power within each line, if each product has a cadre of customers in which it enjoys a decisive advantage." *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20, 30 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). *See United States v. Grinnell*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The First Circuit has stated that "product superiority * * * is one indication that a product may enjoy a specialized

An average installation of artificial turf costs in the range of $400,000 to $500,000, as compared to the minimal cost of planting a grass field. Its vendors are specialized. Monsanto's Recreational Products Division and SuperTurf were the only vendors of artificial turf at the time of trial, and neither are involved in the sale of grass seed and fertilizer.

 We seriously question whether an issue of fact was raised as to the relevant market in this case. Even if we ruled as a matter of law, however, that the relevant market consists only of artificial turf, the plaintiff has not preserved for review any error the trial court may have committed in submitting this issue to the jury.

The plaintiff moved generally for a directed verdict on the federal law issues of liability at the close of its case and at the close of all the evidence. This Court has held that

> where the litigation is made up of independent issues or counts a general motion for a directed verdict will not alone preserve for review the sufficiency of the evidence to support each independent factual issue * * *. A general motion can only go to the case in its entirety and not to the individual submissions. To preserve the individual issues in such a case the appellant must move for a pre-emptory or verdict directing instruction on each of the individual issues which he is challenging, move the challenged issue be removed from consideration of the jury, or object to the instructions on those individual issues setting forth as a reason the lack of supporting evidence or conclusiveness of the proof.

*Rochester Civic Theatre v. Ramsay*, 368 F.2d 748, 752 (8th Cir. 1966).

The plaintiff-appellant took none of the three courses of action prescribed by *Rochester Civic Theatre* as necessary to preserve an individual issue for review. Counsel did not move for a verdict directing the jury to find artificial turf as the relevant market, or move to remove this issue from the jury's consideration. Counsel did not object to the relevant market instructions given, but rather, explicitly limited its jury charge objections to two matters: the instruction concerning trebling of damages, and the court's refusal to instruct on plaintiff's tort claim.

Thus, our review of the sufficiency of the evidence is limited to the case as a whole, *i. e.*, whether a jury question was raised as to any of the requisite elements of plaintiff's monopolization claim. Because we find that defendant's evidence raised at least one such submissible issue of fact, the plaintiff's general directed verdict and judgment n. o. v. motion was properly denied.[6]

It would not have been sufficient for SuperTurf to have proven that Monsanto possesses monopoly power in the relevant market; "[t]he mere possession of monopoly power does not *ipso facto* condemn a market participant." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). SuperTurf also had to establish that Monsanto's alleged monopoly power was "willfully obtained or maintained." *United States v. Grinnell, supra*, 384 U.S. at 570–571, 86 S.Ct. at 1703–05.

clientele and thus inelastic demand." *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.*, 508 F.2d 547, 554 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

**6.** Our holding that plaintiff's directed verdict motion was properly denied necessarily disposes, as well, of its argument that the district court erred in failing to order a new trial because the verdict is contrary to the weight of the evidence. When a jury has reached its

determination, the district court can disturb the result and order a new trial on insufficiency of the evidence grounds only if a "miscarriage of justice" has occurred. *See Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). Where, as here, the evidence is such that reasonable persons could differ as to the result, the jury's choice of one possible verdict over the other cannot be considered a miscarriage of justice.

SuperTurf does not contend that Monsanto unlawfully *acquired* monopoly control of the artificial turf market. Monsanto invented the concept of artificial turf,[7] and no other firm attempted to enter the market until 1968. Rather, SuperTurf contends that it has established, as a matter of law, that Monsanto has a "monopoly" that was *willfully maintained* through exclusionary practices. Monopoly power innocently obtained cannot be wielded to tighten the monopolist's control of the market. *See Berkey Photo, Inc. v. Eastman Kodak Co., supra*, 603 F.2d at 275. We conclude, however, that there was sufficient evidence from which a reasonable jury could find that Monsanto's market power was not "willfully" maintained in violation of section 2 of the Sherman Act.[8]

SuperTurf maintains that Monsanto engaged in "unreasonable" anti-competitive behavior that runs afoul of the "rule of reason" standard established in *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910). Specifically, SuperTurf charges that Monsanto: (a) published its own customer bid specifications to "eliminate competition from SuperTurf" and "conspired" with customers' architects or "compelled them" to adopt Monsanto's specifications in public bidding contests; (b) priced "below cost;" (c) engaged in "product disparagment;" and (d) "harassed" and "surveilled" the plaintiff.

■ While there was evidence from which the jury could conclude that Monsanto engaged in anti-competitive "predatory conduct," there was sufficient contrary evidence to support a jury finding that Monsanto's actions were only those of a normal, properly aggressive competitor. A monopolist may not take measures with the purpose of preventing effective competition; it may, however, aggressively compete in the marketplace. *See International Travel Arrangers, Inc. v. Western Airlines*, 623 F.2d 1255, 1268 (8th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980).

Regarding SuperTurf's charge that Monsanto sought to " 'spec' them out of the market," witnesses from SuperTurf, Monsanto and 3M (manufacturer of Tartan-Turf) testified that they routinely distribute their products' specifications, meet with architects to discuss them, and argue the merits of their products. *See George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.*, 508 F.2d 547, 556 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). Even if one accepts SuperTurf's argument that the adoption of one product's specifications precludes further competition,[9] it is also true that Super-Turf is free to press for the adoption of its own product specifications. We later note that in one instance, involving the bidding process at Boise State University, the jury could reasonably find that Monsanto shut SuperTurf out of pre-specification competition.[10] SuperTurf did not prove this as a matter of law, however, and cites no other incidents in which SuperTurf was prevented from competing prior to the adoption of

---

7. Monsanto developed artificial turf in response to a request by the Ford Foundation. The Foundation's aim was to provide urban children with appropriate playing surfaces. This concern arose after a Department of Defense study concluded that urban children had less stamina and less energy because their "play" was inhibited by the constraints of romping on a concrete playground.

8. We need not, therefore, reach the question of whether Monsanto's evidence rebutted the presumption of monopoly power raised by its large market share (approximately 75–80%). *See United States v. Grinnell Corp.*, 384 U.S.

563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

9. Many states, including Missouri, require contracts to contain an "or equal" clause allowing products to bid even though they do not meet bid specifications. Paschal testified, for example, that SuperTurf won two artificial turf bids, the "Mesquite" and "Garland" projects, despite the fact that the bid documents specified "AstroTurf" by name.

10. *See* pp. 1285 thru 1287, *infra*.

a project's specifications.[11] *See Security Fire Door Co. v. County of Los Angeles,* 484 F.2d 1028, 1031 (9th Cir. 1973).

There is also evidence from which a jury could conclude that Monsanto's pricing practices were "reasonable" and not predatory. SuperTurf does not contend that it proved that Monsanto sold fields below their "average variable cost."[12] They argue, rather, that Monsanto sold its product at less than "fully-allocated" costs,[13] and that this practice was intended to harm SuperTurf. Pricing below "fully-allocated costs" but above "average variable costs" is not per se predatory; to the contrary, such pricing has been considered " 'the competitive and socially optimal result' of § 2 enforcement." *California Computer Products v. IBM,* 613 F.2d 727, 743 (9th Cir. 1979). *See Northeastern Tel. Co. v. AT&T Co.,* 651 F.2d 76, 87–88 (2d Cir. 1981). While there may be instances in which a monopolist who reduces its prices only to some point above marginal or average variable costs may still be held to have engaged in a predatory act, there was evidence here from which the jury could conclude that neither predatory intent, *see Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 696 & n.12, 87 S.Ct. 1326, 1332, n.12, 18 L.Ed.2d 406 (1967), nor other aspects of Monsanto's conduct rendered its admittedly above-average-variable-cost pricing "unreasonable." *See Cali-*

*fornia Computer Products v. IBM, supra,* 613 F.2d at 743. Israel testified that prices on each account were determined by competitive factors, such as the amount of money an institution has available, the extent of the customer's commitment to go from natural grass to synthetic turf and how well received AstroTurf is in relation to its competitors. He maintained that Monsanto engaged only in competitive defensive pricing. This testimony was bolstered by SuperTurf salesman Walter Evanko, who admitted that SuperTurf initiated price warfare in artificial turf. Even if Monsanto is a monopolist, it was within its rights to respond to the lower prices of its competitors while still pricing above its marginal costs. *See id.* at 741–742.

A jury could also reject SuperTurf's claim that Monsanto had unreasonably disparaged SuperTurf's product and engaged in "commercial espionage, harassment, and surveillance." Israel testified that Monsanto had done nothing more than study SuperTurf for purposes of improving its own product and to find out "what [we've] got to compete against." SuperTurf's president, Mr. Paschal, admitted that he had "no objection" to anyone getting a sample of his product and testing it; and that "it's good for competition for competitors to look at each other's products and be able to tell customers the true facts." SuperTurf's

---

11. SuperTurf introduced evidence that the artificial turf specifications adopted by the architect for the stadium at Central Missouri State were proprietary specifications written around Monsanto's product. The architect testified, however, that at the time he prepared the specifications, he had not even heard of SuperTurf. After the architect was contacted by a SuperTurf salesman, he added an addendum to the specifications which stated that SuperTurf may be considered as an "equal product."

12. Variable costs are those costs which fluctuate with a firm's output, including such items as materials, fuel, maintenance, licensing fees and depreciation occasioned by use. Average variable cost is the sum of all variable costs divided by output. Marginal costs are "the increment to total cost that results from producing an additional increment of output." 3 P. Arreda & D. Turner, Antitrust Law ¶ 712, at

155. Marginal costs are more relevant for antitrust purposes but are more difficult to ascertain because they cannot be determined from traditional accounting methods. The courts often rely, therefore, on average variable cost figures to evaluate challenged pricing practices. *See Northeastern Tel. Co. v. AT&T Co.,* 651 F.2d 76, 88 (2d Cir. 1981); *California Computer Products v. IBM,* 613 F.2d 727, 742–743 n.27 (9th Cir. 1979).

13. "Fully-allocated costs" are the sum of variable costs and "fixed costs." Fixed costs generally include, *inter alia,* management expenses, interest on bonded debt, irreducible overhead and depreciation occasioned by obsolescence. *See Northeastern Tel. Co. v. AT&T Co., supra,* 651 F.2d at 86.

own salesman obtained AstroTurf samples and its technicians tested them. SuperTurf also claims that "every SuperTurf problem, however slight, was emphasized to potential customers." It has been noted, however, that "[a]dvertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2." *See Berkey Photo, Inc. v. Eastman Kodak Co., supra*, 603 F.2d at 287–288. A monopolist similarly cannot be expected to remain silent as to unfavorable aspects of its competitors' products when dealing with potential customers. SuperTurf does not claim that Monsanto's salesmanship has amounted to deception. In sum, a jury could conclude that Monsanto's conduct and aims were lawful—that of "beating [SuperTurf] in the marketplace" rather than "crippling the organization of a competitor." *See International Travel Arrangers, Inc. v. Western Airlines, supra*, 623 F.2d at 1268, *citing George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc., supra*, 508 F.2d at 562.

Finally, viewing the evidence in the light most favorable to Monsanto, the jury could conclude that Monsanto remains the dominant firm in the artificial turf market because of the superiority of its product. Although a significant amount of testimony was introduced to the effect that SuperTurf is as good as or better than AstroTurf, other witnesses expressed a strong preference for AstroTurf. For example, Wayne Gallagher, General Manager of the organization responsible for the Cotton Bowl, testified that he recommended AstroTurf to his organization in part because he and others had been very satisfied with the previous AstroTurf installation at the Cotton Bowl. Jack Patterson, Athletic Director at Baylor University, similarly testified that he wanted the school's worn AstroTurf field to be replaced by the same company because of his favorable experience with the product and the servicing performed by Monsanto. Patterson also noted that SuperTurf had been installed in

a portion of their athletic facilities, and that they were dissatisfied with the product. There was also evidence in the record that SuperTurf lost bids on some fields because the customers had observed SuperTurf's poor workmanship at its installation at Hofstra University.

A number of witnesses testified that their institutions installed AstroTurf after their chemical engineering tests indicated its qualities were superior to SuperTurf's. Paul Drage, an alderman involved with the decision to install AstroTurf at Ivor Wynne Stadium, Hamilton, Ontario, testified that an important factor prompting him to recommend AstroTurf was that SuperTurf was much more flammable. Drage further testified that SuperTurf emitted toxic fumes when ignited.

In summary, we conclude that SuperTurf did not establish as a matter of law that Monsanto's alleged "monopoly power" was willfully maintained by acts which exceeded the bounds of competitive propriety. The trial court properly denied SuperTurf's directed verdict motion on its monopolization claim.

### Attempt and Conspiracy to Monopolize

SuperTurf also alleges that Monsanto attempted to monopolize and conspired to monopolize in violation of section 2 of the Sherman Act. The jury was properly instructed on these claims and rejected them at trial. The plaintiff gave these claims very cursory treatment at trial and on appeal, and they do not require extended discussion here. Again, we are limited by the general nature of plaintiff's directed verdict motion to determining whether a jury question was raised as to any of the requisite elements of its attempt and conspiracy claims.

In order to establish that Monsanto "attempt[ed] to monopolize * * * any part of the trade or commerce among the several States" under 15 U.S.C. § 2, SuperTurf was required to show Monsanto's spe-

cific intent to monopolize and a dangerous probability of success within a relevant product and geographic market. *See United States v. Empire Gas Corp.*, 537 F.2d 296, 298–299 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). The specific intent required is "an intent to control prices or to restrict competition unreasonably." *Id.* at 302. SuperTurf has simply not proved, as a matter of law, either through direct or circumstantial evidence, that Monsanto had such intent; its directed verdict motion was thus properly denied.

■ Similarly, a "conspiracy to monopolize" claim requires a showing of defendant's specific intent to monopolize. Moreover, it must be shown that the defendant's alleged coconspirators—*i. e.*, its customers and agents of customers, such as architects and engineers—shared its specific intent to create a monopoly for Monsanto or to unreasonably exclude SuperTurf. *See American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1945). Again, SuperTurf has failed to prove as a matter of law such shared intent, and its directed verdict motion on its conspiracy claim was properly denied.

### III

### THE STATE LAW CLAIMS

SuperTurf also complains that the district court should not have, in effect, forced the plaintiff to elect between its antitrust and common law tort claims at trial. The plaintiff submitted proper jury instructions regarding its state law claims, and wanted the jury to consider those charges as well as its antitrust claims. The district court was concerned, however, that a duplicative damage award would result. At the close of the evidence, the court stated:

> The Court has no objection to you submitting to the jury business interference both for actual damages and for punitive damages, and also submitting to the jury the anti-trust theories which you have, which include treble damages, but because of the fact that business interference is included in the anti-trust matters, the jury will have to take their choice between one or the other. * * * I'll submit them both if you want, or I'll submit one or the other, but they cannot return a verdict on both.

Thus, the plaintiff, tactically unwilling to leave the election to the jury, had to abandon one or the other of its claims.

The district court need not have taken such a draconian approach. The plaintiff specifically requested a special verdict form that would have required the jury to state whether the defendant had violated the antitrust laws, what plaintiff's resulting damages were, whether the defendant had interfered with plaintiff's business relations, and what punitive damages should be awarded as a result of its tortious conduct. If the jury determined that the defendant's conduct had been tortious, it was to simply answer "yes or no" to the question of whether the plaintiff was damaged as a result, and then determine the *punitive* damages to be awarded. Thus, the plaintiff agreed with the trial judge that it could not recover actual damages under both liability theories. The plaintiff did, however, seek to recover trebled actual damages on its antitrust claim and punitive damages on its common law tort count. The plaintiff argued that such an award would not be duplicative because treble antitrust damages are compensatory in nature and not punitive. That argument is foreclosed by this Court's opinion in *Arnott v. Am. Oil Co.*, 609 F.2d 873, 888 (8th Cir. 1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), where we held that punitive and treble damages cannot both be awarded for violation of the antitrust laws.

The erroneous rationale for plaintiff's request does not diminish the fact that, in substance, its proposed verdict form was proper. We appreciate the district court's concern that an award of actual damages

on both counts, or treble damages on the antitrust count and punitive damages on the state law count would be duplicative. *See Carl Wagner & Sons v. Appendagez, Inc.*, 485 F.Supp. 762, 776 (S.D.N.Y.1980). The court erred, however, in not granting plaintiff's request to submit a special verdict form and instruct the jury on its state law claims. Had it done so, the court could have molded the verdict to eliminate its duplicative aspects, while preserving for review the jury's determination on both liability theories.[14]

The defendant-appellee argues that any error committed by the trial court in failing to instruct the jury on plaintiff's tort claims was "harmless" because the plaintiff did not prove these claims at trial. Although the appellant vigorously maintained at oral argument that this error was not harmless, the sketchy nature of its brief in this regard impeded the Court from evaluating whether, in fact, there was sufficient evidence introduced at trial to go to the jury on plaintiff's tort claims. As a result, the appellant was requested to submit a list of the specific "business expectancies" with which the defendant allegedly tortiously interfered, and to refer the Court to those portions of the voluminous record (47 volumes of transcript and over 3,000 exhibits) in which evidence supporting these claims could be found. Plaintiff's response listed nine stadia installations where events giving rise to its state law claims allegedly occurred. The appellee was given an opportunity to respond to this submission.

The plaintiff maintained at trial that the law of the State of Missouri should be applied to its tortious interference claims, arguing that that state has the most significant relationship to the occurrence and the parties. *See Kennedy v. Dixon*, 439 S.W.2d 173 (Mo.1969) (*en banc*); Restatement (2d) *Conflict of Laws* (1971) § 145. The plaintiff relied on two factors: (1) its allegation that "the conduct causing the injury in all instances occurred in Missouri at Monsanto's corporate headquarters" and (2) Monsanto's Missouri residency. The district court did not reach the choice of law question. For purposes of our review, we will accept the plaintiff's contention that Missouri law applies.[15]

The law of Missouri does afford protection against unjustified interference with reasonable expectancies of commercial relations even where an existing contract is lacking. *See Downey v. United Weather Proofing*, 363 Mo. 852, 253 S.W.2d 976, 980 (1953). The plaintiff must prove the following elements to establish a prima facie case of interference with business relationships:

(1) existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy;

(2) knowledge of the relationship or expectancy on the part of the defendant;

(3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy;

(4) the absence of justification; and

(5) resultant damage to the party whose relationship or expectancy has been disrupted.

*Harber v. Ohio Nat'l Life Ins. Co.*, 390 F.Supp. 678, 683 (E.D.Mo.1974), *aff'd*, 512 F.2d 170 (8th Cir. 1975). *See Salomon v. Crown Life Ins. Co.*, 536 F.2d 1233, 1238

---

**14.** The Court in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), although not faced with the precise issue here, expressed its preference for special verdicts or interrogatories to the jury in large and complex antitrust cases. "In that way the right to a jury trial of all factual issues is preserved while the probability of a laborious and expensive retrial is reduced." *Id.* at 279 (footnote omitted).

**15.** The defendant has not contended at trial or on appeal that another state's laws would be more appropriately applied to the plaintiff's claim and, in fact, relied on Missouri case law in its brief regarding the plaintiff's state law claims.

(8th Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *Williams v. Irwin-Willert Co.,* 604 S.W.2d 640, 643 (Mo. App.1980).

█ Viewing the evidence, as we must, in the light most favorable to the plaintiff, we conclude that a reasonable jury could have found that the plaintiff established a prima facie case of tortious interference with business expectancies regarding only one stadia installation: the football field at Boise State University.

Boise State University, operating with public funds, installed a new artificial turf playing surface in 1978 following two rounds of "competitive" bidding. Super-Turf introduced a significant amount of evidence tending to show that, in fact, there was nothing "competitive" about this bidding process. Paschal testified that while he was attending a National Athletic Directors Conference, he heard of BSU's plans to install a new playing surface in its football stadium. He was immediately interested in selling his artificial turf product to Boise and sought to obtain the specifications for the project from Boise's architect, Palmer Putnam. Paschal testified that "Putnam told us point-blank he did not want us to bid on the job and he finally just threw a set of plans at Mr. Linville [a SuperTurf salesman] and I." When Paschal read the specifications, he learned that they were written to exclude any product other than Monsanto's AstroTurf.

As a Monsanto interoffice memo noted, "SuperTurf's efforts * * * to open the spec [were] rebuffed." Putnam refused to even meet with SuperTurf personnel to discuss the specifications. SuperTurf was ultimately allowed to submit a bid only after it retained legal counsel and protested to Kenneth Hall, the Director of Public Works in Boise. This appears to have been an empty gesture. At the bid opening, SuperTurf's bid was revealed to be approximately $30,000 to $40,000 lower than Monsanto's. Boise personnel quickly left, saying they would "take it under advisement." They subsequently decided to obtain new bids. The result of the second bid was similar— SuperTurf's bid was approximately $27,000 lower than Monsanto's. Nonetheless, Monsanto was awarded the contract.

There was a great deal of evidence introduced indicating collusive activity between Putnam and Monsanto personnel prior to and during the period the bids were let. According to William Israel, an executive of Monsanto, Monsanto salesman met with Putnam on a "fairly regular basis" from the time Putnam became the architect for the project and throughout the bidding process. A jury could reasonably infer that these meetings resulted in the adoption of proprietary specifications that excluded Super-Turf. Although Israel testified that it was not "company policy" to write specifications to specifically eliminate SuperTurf, the plaintiff introduced memoranda from Monsanto's product manager that expressed just such a goal. And, of course, that object was achieved at Boise State: before SuperTurf even knew the playing surface was to be installed, their product was "spec-ed out."

Monsanto continued to meet with Putnam and other Boise personnel for the apparent purpose of thwarting SuperTurf's competitive efforts. SuperTurf introduced a series of memorandum from Henry Hair, a Monsanto salesman, describing some of these contacts. On November 23, 1977, Hair requested that Monsanto personnel contact Lyle Smith, the Athletic Director at Boise State. Smith was planning visits to various SuperTurf installations, and Hair wanted someone from Monsanto to "give [him] tips on how best to take pictures to show failure and how to kick loose tufts and how to see shiners." This contact was, in fact, made: a later memo stated that "Milner [a Monsanto executive] has discussed situation with Lyle as to what to look for on each field and how best to photograph defects * * *." A November 16, 1977, memo stated that Putnam wanted detailed information regarding the problems and

failures of specific SuperTurf fields. It also noted that Putnam had informed Monsanto personnel that he, as the project's architect, could not protest a firm's bid, but suggested that Monsanto could.

SuperTurf and Monsanto were both given the opportunity to promote their artificial turf products via presentations before a committee of decisionmakers at Boise State. Monsanto's internal documents reveal, however, the futility of SuperTurf's appearance. Hair noted that "Putnam picked my brain for ammunition to use during SuperTurf's presentation," and in a subsequent memorandum, stated that "Putnam * * * walked out before [SuperTurf's] presentation was complete." Putnam apparently stayed long enough to further Monsanto's interests. He later provided Monsanto personnel with details about SuperTurf's presentation and sales claims.

A jury could reasonably conclude from this and other evidence in the record that SuperTurf had a valid business expectancy to procure the Boise State contract by competitively pricing its product, and that the defendant knew of SuperTurf's intent to successfully compete. See *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315–316 (Mo. 1979) (*en banc*). A jury could also reasonably conclude that Monsanto successfully and intentionally interfered with this expectancy, resulting in the loss to SuperTurf of profits it would have obtained by winning the contract.

■ We concede that a jury might be reluctant to find that the plaintiff established an "absence of justification" for defendant's conduct. The Missouri common law recognizes that intentional interference with plaintiff's business expectancies may be "justified" if defendant's aim is "to protect its valid economic interests." *Salomon v. Crown Life Ins. Co., supra,* 536 F.2d at 1242. The "privilege" to vigorously compete is not unlimited, however. In *Fischer, Spuhl, Herzwurm & Associates, Inc. v. For-*

*rest T. Jones & Co., supra,* 586 S.W.2d at 315–316, the Supreme Court of Missouri, sitting *en banc*, held that the plaintiff, an insurance brokerage firm, stated a cause of action for intentional interference with its business expectancies by alleging the following: that the defendant had "conspired with school districts and entered into illegal 'tying' agreements, under which districts could obtain group accident and health insurance only if they purchased group life insurance, and other anticompetitive agreements that caused school districts to refuse to deal with appellants and other competitors of respondents," and, further, that the defendants gave "financial contributions and gifts to school board members and employees" in order to shut out their competitors. The *Fischer* holding accords with the Restatement (2d) of Torts § 768, which provides that one's competitive aim justifies intentional interference with prospective contractual relations only if " * * * (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade."

We are reluctant to hold as a matter of law that Monsanto's alleged tortious interference at Boise State was "justified" by its competitive aims. The jury should have been given an opportunity to consider SuperTurf's state law claim regarding this installation. We, therefore, reverse and remand for a new trial limited to evidence relating to the events surrounding the purchase and installation of AstroTurf at Boise State University.

There is no evidence to support SuperTurf's contention that Monsanto intentionally interfered with its business expectancies regarding the eight other stadia installations at issue. Three of these contracts—the stadiums in Mesquite, Texas; Pasenda, Texas; and Lindenwood, Missouri—were awarded to SuperTurf. Thus, the evidence submitted by the plaintiff relating to those contracts is only relevant to the extent it sheds light on Monsanto's intent in its dealings with other potential customers. The

same is true of evidence regarding the bidding process at Central Missouri University. The Board of Regents of that institution voted to retain their natural grass playing surface. There is no evidence that the Board was dissuaded from installing Super-Turf because of conduct on Monsanto's part. Rather, the evidence simply shows that both firms vigorously competed for the contract and both lost.

The other four installations at issue were awarded to Monsanto despite lower bids or offers proferred by SuperTurf. There was absolutely no evidence of wrongdoing introduced regarding two of those fields—the Cotton Bowl in Dallas, Texas, and Rice University. The most favorable inference that can be drawn from plaintiff's evidence regarding the installation at Baylor University is that Jack Patterson, Baylor's Athletic Director, made up his mind before the competitive process started that he wanted AstroTurf. Baylor had had an AstroTurf field for some time that needed to be replaced, and Patterson had been impressed with the quality of the product and Monsanto's service personnel.

There is a similar paucity of evidence in the record to support SuperTurf's claim that Monsanto tortiously interfered with SuperTurf's expectancy to obtain the installation contract at Busch Stadium, St. Louis, Missouri. The most "insidious" conduct SuperTurf could cite was a $500,000 donation by Monsanto to the Convention Center project in St. Louis. SuperTurf implied that this donation was made to influence civic leaders involved in the stadium surface decision to choose AstroTurf. This inference, even if sufficient to support SuperTurf's tortious interference claim, is simply not supported by the record.[16]

## IV

## COST AWARD

SuperTurf's final argument is that the trial court abused its discretion in awarding Monsanto, the prevailing party below, its entire submitted Bill of Costs totaling $61,848.50. See F.R.Civ.P. 54(d). In light of our holding reversing the judgment in part, we need not determine at this time whether the trial court abused its discretion by awarding such an admittedly high amount.

A party who has obtained some relief usually will be considered the "prevailing party" under F.R.Civ.P. 54(d) even if it has not succeeded on all of its claims. See Jones v. Diamond, 594 F.2d 997, 1028 (5th Cir. 1979); K–2 Ski Co. v. Head Ski Co., 506 F.2d 471, 476–477 (9th Cir. 1974); Lewis v.

---

**16.** SuperTurf further charges that the district court failed to properly instruct the jury in two additional respects. Neither of these alleged errors are significant.

First, SuperTurf argues that the trial court erred by instructing the jury that any antitrust damages awarded to SuperTurf would be trebled. The court further instructed the jury that they were to assess damages based upon the actual loss incurred, if any.

The courts are in conflict as to whether such an instruction is proper. Compare Semke v. Enid Auto. Dealers Ass'n, 456 F.2d 1361, 1370 (10th Cir. 1972); Pollock & Riley, Inc. v. Pearl Brewing Co., 498 F.2d 1240, 1242–1243 (5th Cir. 1974); with Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 203 F.2d 676, 678 (2d Cir. 1953). We have found no case from this Circuit reaching that issue, and need not resolve it here. We note that even if the instruction was erroneous, SuperTurf was not substantially prejudiced by its use in light of the jury verdict absolving Monsanto of anti-trust liability. See Sulmeyer v. CocaCola Co., 515 F.2d 835, 852 (5th Cir. 1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); Semke v. Enid Auto. Dealers Ass'n, supra, 456 F.2d at 1370.

Second, SuperTurf complains that the trial court failed to define "preponderance of the evidence" in its jury charge. On this record, we conclude that this error was harmless.

SuperTurf also presses for a new trial based on an evidentiary ruling of the district court. At trial, SuperTurf attempted to introduce a memorandum from Patrick Arnall, an in-house attorney for Monsanto, to various members of the AstroTurf staff. Monsanto successfully objected on the basis that the communication was protected by the attorney-client privilege. We have examined the memorandum and conclude that the district court did not abuse its discretion by excluding it at trial.

*Pennington,* 400 F.2d 806, 820 (6th Cir.), *cert. denied,* 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968). Moreover, the prevailing party at a second trial may be awarded the costs of both trials. 10 Wright & Miller, Federal Practice and Procedure § 2667, at 132. *See Yedlin v. Lewis,* 320 F.2d 35, 36 (5th Cir. 1963). The district court, therefore, will have to reconsider its cost award to Monsanto if, upon retrial, SuperTurf is successful on its state law claim involving the field at Boise State.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. SuperTurf will bear its costs for this appeal and will also be taxed for one-half of the costs incurred by Monsanto on this appeal.