## DETROIT GRAPHITE CO. v. HOOVER et al. (two cases).

### Nos. 2424, 2425.

Circuit Court of Appeals, First Circuit.

June 5, 1930.

John M. Raymond, of Boston, Mass., and James V. Oxtoby, of Detroit, Mich. (Law-

rence E. Brown, of Detroit, Mich., on the brief), for appellant.

Henry B. Cabot, Jr., and John G. Palfrey, both of Boston, Mass. (Charles C. Cabot, and Warner, Stackpole, Bradlee & Cabot, all of Boston, Mass., on the brief), for appellees.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

ANDERSON, Circuit Judge.

These cross-suits arise out of a contract of employment of Hoover by the Detroit Graphite Company, for five years from March 31, 1923. Hoover contends that the contract was broken by the Detroit Company in March, 1926; the Detroit Company contends that it was then ended by mutual agreement; that Hoover then owed the company $11,770.59 for advances made to him under the contract; it brought suit therefor. The jury found for Hoover, in both suits, and assessed his damages for breach of contract at $50,000.

The main questions arise from the company's contentions that the court erred in leaving the construction of the correspondence leading to the termination, to the jury, as a question of fact, and in denying the company's motions for directed verdicts in both suits. Other questions presented arise out of the rulings as to damages.

Hoover is a graduate of the Massachusetts Institute of Technology in 1913. Shortly after he entered the employ of the Detroit Company, a large manufacturer and distributor of paint in Boston and in New York; in 1919 he went, under a written contract, to the Pacific Coast to introduce its business in that section. On March 31, 1923, he made another written contract, out of which this controversy arises.

The contract covered, as Hoover's territory, California, Oregon, Washington, and Alaska. The contract proceeds:

"2. Remuneration:

"(a) Mr. Hoover is to be credited on the net collections from all sales made at the company's list, originating within the territory as follows:

"On paint in barrels selling at $2.00 per gal. or less at rate of 16%.

"On paint in barrels selling at $2.10 to $2.50 per gal. at rate of 15%.

"On paint in barrels selling at $2.51 per gal. up at rate of 14%.

"(b) Divisional Credits: Divisional credits to be issued in proper proportion, based on expense, time and co-operation (Company's decision to be final) on business originating without the territory where paint is shipped into the territory or vice versa.

"(c) Specification paints or other competitive business: Credits will be determined by the Company.

"(d) Paints sold at prices in excess of list: On point sold at prices of list Detroit figures and full delivery costs, the overage is to be credited to Mr. Hoover.

"(e) A statement of all credits, and showing the condition of Mr. Hoover's account, shall be issued on or before the 10th day of each month covering shipments of the month preceding.

"(f) Drawing Account: $1250 per month to be advanced Mr. Hoover in all months that the credit balance in his favor equals or exceeds this amount, against sales credits to be earned, otherwise the monthly drawing account shall be $1,000.00 per month. When the earned credits for any year shall be in excess of moneys advanced to Mr. Hoover, 75% of the excess due him from the company at the close of such year shall be paid—the remaining 25% to be retained by the company at 6% interest and applied against any unearned drawing account in the ensuing year.

"(3) Freight and storage.

"When freight is prepaid the amount of prepayment is to become a charge against Mr. Hoover, except it be covered in the selling price. All paint stored on the Coast is to be the property of the Company and insured by them, the cost of storage and delivery to the purchaser to be assumed by Mr. Hoover.

"(4) Collections:

"All invoices will be rendered from Detroit but in view of time required for transmission of mail, an invoice upon request of purchaser may be rendered by Mr. Hoover on Detroit bill heads per instructions on purchaser's order, and carbon copy mailed promptly to Detroit.

"(5) Credits Extended to Customers:

"These to be subject to the approval of the Company. Where deliveries are made from Coast stock prior to receipt of Company approval of credit extension, one-third of any loss resulting from such delivery or ill advised credit shall be charged to Mr. Hoover's account.

"(a) He is to be furnished with Dun or Bradstreet letters, and in the event of uncertainty will wire Detroit the opinion of these agencies and other references, when he feels that any doubt exists.

"(b) Claims for Loss or Damage: Where claim is to be made from Detroit for loss or damage by transportation companies, warehouse or truckmen—all papers, receipts and affidavits shall be carefully assembled and immediately transmitted to Detroit in proper form by Mr. Hoover.

"6. In consideration of exclusive sales rights in the territory, and remuneration specified, Mr. Hoover agrees to give his undivided time and exclusive effort to the promotion of the Detroit Graphite Company's business for the period of five years from above date and is hereby granted the option of renewing this agreement for a like period upon the same terms or such other terms as he and the Company may then agree upon.

"Mr. Hoover is to establish and maintain suitable office and subagents or selling connections for the proper handling of the Company's business. He is to cover the entire territory in person as may be necessary for its development and operation, and is to assume and pay all expenses of every character."

Under the course of business under the contract, the company paid, on vouchers approved by Hoover, commissions to subagents, freight and storage, cartage charges on the Coast, and his drawing account of $1,000 a month—as a minimum—or, until the fall of 1925, $1,250 a month. Hoover paid from his drawing account his personal, traveling, office and incidental expenses; but the other expenses incurred by him in establishing the company's business on the Pacific Coast were paid by the company and charged up as against his commissions and overages. When in 1925 these charges exceeded the amount of his earned commissions, his drawing account was reduced from $1,250 to $1,000 a month. Hoover agreed that this was the company's right under the contract. At one time the company loaned him $1,000, which was repaid by deducting $100 a month from his drawing account. Business on the Coast was good in 1923 and most of 1924, but fell off in 1925; it improved in 1926, and was excellent during the next two years. This temporary slump in business was the primary cause of dissension and the rupture of the long-term association between the parties.

▆ The crux of this case is whether the contract between the parties was broken by the company, or was terminated by mutual agreement. The court left this question to the jury, instructing them also that, if the company broke the contract, it could not recover in its suit for the advances made on Hoover's account. These rulings are attacked as error. We may start our consideration of the correspondence (relied upon by the company as a cancellation by agreement) between Davis, the company's president, and Hoover, by Davis' letter on March 12, 1926, received by Hoover on March 17 in Los Angeles.

After reference to earlier letters and telegrams, pertaining to the unsatisfactory status of relations under the contract, Davis said:

"I would add here that any disbursements made on your account from March 1 will be charged against your drawing account allowance for this month."

This was plainly inconsistent with the company's obligation under the contract; Hoover might have treated it as a breach, for he was entitled to a minimum drawing account of $1,000 a month, whatever the status of the commission account and whether or not he was ultimately liable for the advances made by the company to his subagents and for other expenses. To this Hoover replied by telegram March 17:

"Recognize now your desire to force my resignation by your handling March check and general attitude. I am entitled to advance notice relative your decision covering March funds, and assuming wires had fully covered discussion as doing business as usual; had counted upon check for one thousand. In view your expressed wish I agree mutual cancellation of contract, provided you will wire balance of five hundred dollars due me for March. Wire answer at once please."

Construing this telegram in the light of the surrounding circumstances, it is not perfectly clear, in at least two particulars: (1) Hoover takes his position on the theory that Davis is forcing his resignation. (2) The phrase "I agree *mutual cancellation,*" etc., is, at least in the light of the conflicting views as to his personal liability for advances, doubtful. The doubt becomes greater when we consider the subsequent telegrams. Davis replied March 18:

"For company I accept your proposal that contract between us be cancelled provided we send you five hundred dollars additional on March drawing account which is being done and your resignation is hereby accepted. This cancellation is made effective today by your proposal and our acceptance which constitute a mutual agreement. *You are of*

*course to reimburse us for debit balance which your account shows either cash or in some manner to be agreed upon.* You well know that there has been no desire to force your resignation but on the contrary repeated expressions of confidence and desire that you should continue with us."

The $500 was sent, but Davis added—to what otherwise might be construed as a flat acceptance of an offer from Hoover to cancel—the following:

*"You are of course to reimburse us for debit balance which your account shows either cash or in some manner to be agreed upon."*

If Hoover's "mutual cancellation" on payment of the $500 balance of the March drawing account meant (as it might well be found to mean) *"mutual releases,"* then Davis' statement that Hoover was to "reimburse us for debit balance" was no acceptance of Hoover's proposition; it was a new term, or condition.

Hoover's reply telegram of March 18 makes the situation still more confused and doubtful. This telegram was sent while he was en route from Los Angeles to San Francisco, and without Davis' letter of March 12 before him. In his telegram he says:

"Referring your letter twelfth, second paragraph accepts my resignation *which I had never submitted.* Your third paragraph suggests I resign, hence my wire seventeenth accepts your proposal, *not otherwise.* Your wire eighteenth therefore confirms cancellation on this basis per terms outlined. In consideration of your wiring me Friday to San Francisco additional five hundred for purchase office furniture including best grade two desks steno desk typewriter two swivel chairs three new arm chairs two Wernicke three draw filing cabinets six sectional files and miscellaneous and giving me full Company's release from any sums or drafts you claim due from me I will turn over all my files and records for continued prosecution your business also afford aid and good will you desire. Wire answer San Francisco Friday."

The words "not otherwise" are at least capable of being construed as meaning that Hoover repudiated the notion that his resignation (the cancellation) had been initiated by him; that he agreed to cancellation only if Davis took the responsibility of admitting that he desired and had initiated steps for it, for he says:

"Your wire eighteenth therefore confirms cancellation on this basis, per terms outlined."

"On this basis" means that Hoover was agreeing to cancellation only if Davis was accepting responsibility for initiating the proceedings. But the phrase "per terms outlined" is clearly rejected by Hoover, for he adds a provision relative to the purchase of his furniture and files, and, what is vital, *"giving me full company's release from any sums or drafts you claim due from me."* This was utterly inconsistent with Davis' proposition "to reimburse us for debit balance." It construes "mutual cancellation" in Hoover's telegram of the 17th as meaning full acquittances by both parties.

It might well be found, or even ruled, from these communications that Hoover was throughout insistent on two things: (1) That his resignation should be admitted to have been asked for by Davis and not submitted by him; (2) that the company should formally release all claims against him for the debit balance.

It is unnecessary to consider performance or nonperformance of the first condition, for admittedly the second—the release of the debit balance—was never made by the company. But the company thereupon treated the contract as at an end, and so notified Hoover's subagents. This warranted the jury in finding a breach by the company. The ruling that the question of the construction of the correspondence was for the jury was sufficiently favorable to the company. Williston on Contracts, § 616; Hodgens v. Sullivan, 209 Mass. 533, 95 N. E. 969; Waldstein v. Dooskin, 220 Mass. 232, 107 N. E. 927; Nashua Iron Co. v. Chandler Co., 166 Mass. 419, 44 N. E. 348; Cunningham v. Washburn, 119 Mass. 224; Arcade Iron Co. v. Jenks, 229 Mass. 95, 118 N. E. 288; Empire Fuel Co. v. Lyons, 257 F. 890 (C. C. A. 6th Cir.); Donner v. Alford (C. C. A.) 136 F. 750; Luse v. Martin, 215 F. 28 (C. C. A. 8th Cir.); Hoffman v. American Mills, 288 F. 768 (C. C. A. 2d Cir.); General Motors v. Abell, 292 F. 922 (C. C. A. 1st Cir.); Pope v. Bibb, 290 F. 586 (C. C. A. 2d Cir.).

▉▉ The court instructed the jury that, if it found that the company broke the contract, it could not recover in its suit against Hoover. The verdict of the jury, therefore, determined all questions of liability between the parties. It is unnecessary to determine whether, apart from the company's breach, the contract should be construed, as Hoover's counsel contend, as limiting the company's

rights to recover the debit balance to the amount of earned commissions. Of course, the contract is, as Hoover's counsel contend, to be construed in the light of the conduct of the parties before the controversy began. Fitzgerald v. First National Bank (C. C. A.) 114 F. 474; Winchester v. Glazier, 152 Mass. 316, 25 N. E. 728, 9 L. R. A. 424; Canadian National Railway v. Jones Co. (C. C. A.) 27 F.(2d) 240; Williston on Contracts, § 623. They urge with much force that the company treated all advances made for expenses just as it did Hoover's drawing account. Plainly, under all the circumstances, the question of construction in this regard made a fair question for the jury. Compare Luce v. Consol. Co., 195 Mass. 84, 80 N. E. 793; Schlesinger v. Burland et al., 42 Misc. Rep. 206, 85 N. Y. S. 350; Richmond Dry Goods Co. v. Wilson, 105 W. Va. 221, 141 S. E. 876, 57 A. L. R. 31; 2 C. J. § 452, p. 787, and 39 C. J. § 207, pp. 133, 154; North Western Ins. Co. v. Mooney, 108 N. Y. 118, 123, 124, 15 N. E. 303.

It remains to consider whether there was reversible error on the question of damages. The breach of the existing contract destroyed Hoover's option to renew it. The court instructed the jury to the effect that, under the agreement, plaintiff was entitled to the minimum of $1,000 a month for the balance of the contract term (twenty-three months), and that, in addition, the jury might find for another five-year term; that from this minimum of $1,000 a month the jury were to deduct such expenses as the evidence showed should be charged against it. Counsel urge error in the instruction that the plaintiff might be entitled to damages, under his option, for another five-year contract. Clearly, this was only stating the time limit on Hoover's rights; the jury might find that there was no other way to give effect to plaintiff's right to damages for the whole period covered by the contract and the option. Compare Central Trust Co. v. Chicago Auditorium Ass'n, 240 U. S. 581, 594, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Williston on Contracts, § 61; Hughes v. Gross, 166 Mass. 61, 43 N. E. 1031, 32 L. R. A. 620, 55 Am. St. Rep. 375; Wolf v. Brook, 18 Que. K. B. 17.

There is nothing in the claim that damages under the optional contract are too speculative. The life of the victim of such a broken contract of employment is also uncertain, but this does not prevent the assessment of damages on the theory that the wronged employee will live through the full period of the contract.

No instructions were given relative to Hoover's duty to mitigate the damages due to the breach by seeking other employment. Apart from the general evidence as to Hoover's education and business experience, there was no evidence on that point. The company's counsel rightly concede that the burden was on it to show what Hoover had earned or in the exercise of reasonable diligence might earn. Maynard v. Royal Worcester Corset Co., 200 Mass. 1, and cases cited pages 6, 7, 85 N. E. 877; American Trading Co. v. Steele, 274 F. 774; Seymour v. Oelrichs, 156 Cal. 782, 802, 106 P. 88, 134 Am. St. Rep. 154; Ransome Concrete Co. v. Moody (C. C. A.) 282 F. 29; Lillard v. Kentucky Dist. Co., 134 F. 168, 178; opinion by Judge Lurton (C. C. A. 6th), where the court said:

"The burden of proving that the damages which have been sustained in such cases could have been prevented rests upon the party guilty of the breach of contract." Sedgwick on Damages, § 667, and cases cited. Compare Pierce v. Tenn. Co., 173 U. S. 1, 16, 19 S. Ct. 335, 43 L. Ed. 591.

While the eighteenth assignment sets up error in the charge on damages, it nowhere appears that counsel for the company directed the court's attention specifically to the contention now made—that the rule of damages is that, "Deduction should, of course, be made of any sum that the plaintiff might have earned in the past or might earn in the future." Pierce v. Tenn. Co., 173 U. S. 1, 16, 19 S. Ct. 335, 341, 43 L. Ed. 591.

As already noted, it offered no evidence directed to that particular point. There was testimony from Hoover as to his earnings under the prior contract of 1919; that, after the company's breach, he sought similar employment without success; and the general evidence as to his education and business experience. No assignment of error brings specifically to this court the omission of this general rule as error. On such a record, only the disproportionate size of the verdict entitles the question to serious consideration.

Parenthetically, we see nothing in the assignments of error 19–26 based on the overruled motion for a new trial (on the usual grounds) which would take that question out of the general rule that motions for a new trial are to be treated as within the trial court's discretion. Indianapolis v. Horst, 93 U. S. 291, 23 L. Ed. 898; B. & M. R. R. v. Dutille (C. C. A.) 289 F. 320, 324; Slip Scarf Co. v. Filene's Sons Co. (C. C. A.) 289 F. 641, 646; Odell Mfg. Co. v. Tibbetts (C. C. A.) 212 F. 652, 656; Eteenpain Co-op.

Soc. v. Lillback (C. C. A.) 18 F.(2d) 912, 915. But it is at least a doubtful question whether, if the jury's attention had been directed to the point that Hoover's right to damages was subject to diminution by the amount that he might in the future earn, their verdict might not have been substantially different.

Another unassigned error is that Hoover's damages are only the present worth of amounts recoverable for the future. Compare Chesapeake & O. R. R. v. Kelly, 241 U. S. 485, 489, 36 S. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367; Puller v. Royal, etc., Co., 271 Mo. 369, 393, 196 S. W. 755. Hoover's counsel concede this, but answer that this point was never brought to the court's attention. But it has weight on the question of remitting the parties to a new trial on damages.

On the whole, we think that it was reversible error to charge the jury that Hoover's damages were to be reckoned at $1,000 a month as a minimum, diminished only by expenses chargeable to his drawing account.

The general result is that—

In No. 2424, the judgment of the District Court is affirmed, with costs; in No. 2425, the judgment of the District Court is vacated, the verdict set aside only as to damages, and the case stands for a new trial, on damages only; the appellant recovers costs of appeal.