CONJUGAL PARTNERSHIP COMPRISED BY JOSEPH JONES, VERNETTA G. JONES H/N/C, STENOGRAPH SYSTEMS, Plaintiff,

v.

The CONJUGAL PARTNERSHIP COMPRISED BY ARTHUR PINEDA AND TONI PINEDA, Defendant.

No. Civ. A. 90–1051(G).

United States District Court, D. Puerto Rico.

June 29, 1992.

---

Ismael E. Marrero, Hato Rey, P.R., for plaintiff.

Ramón E. Rivera Muñoz, Jiménez, Graffam & Lausell, San Juan, P.R., for defendant.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

A jury trial in this breach of contract case ended with a $225,000 verdict for plaintiffs, and defendants have filed a Motion for Judgment as a Matter of Law or in the Alternative a Motion for a New Trial pursuant to Rules 50 and 59, Fed.R.Civ.P. The prayer for relief in defendants' reply brief adds a second alternative, which we adopt for reasons which follow, of a remittitur reducing the amount of the judgment. Suit having been brought initially in the Superior Court for the Commonwealth of Puerto Rico, removal jurisdiction is predicated on 28 U.S.C. § 1442(a)(3) governing actions against "Any officer of the courts of the United States, for any act under color of office or in the performance of his duties", as explained in an Opinion and Order in this case dated March 26, 1990, 734 F.Supp. 41.[1] Defendants' pending mo-

---

1. The jurisdictional predicate has not affected the parties' or court's choice of controlling sub-

tion was briefed by both parties [2]; neither requested a hearing.

### Introduction

The dispute between the parties, both court reporters, pertains to the division of compensation totalling $465,787 received by defendant Arthur Pineda for producing the stenographic transcript of the protracted Dupont Plaza Hotel fire litigation before Hon. Raymond L. Acosta, in whose session Mr. Pineda was the official court reporter appointed by the court under 28 U.C.A. § 753. Plaintiffs are a conjugal partnership comprising Joseph Jones and his wife Vernetta, known also as Stenograph Systems, Inc. Defendants are a conjugal partnership comprising Arthur Pineda and his wife Toni. In both partnerships,[3] the husband goes to court and records the proceedings and the wife assists his preparation of the computerized transcript by note reading and "scoping," i.e., removing excess words, correcting misspellings and the like before final proof-reading. For over 20 years before the beginning of the Dupont fire trial in March 1989, plaintiff Jones had been a free lance court reporter and instructor of stenotyping in New York state. He came to Puerto Rico in March, 1982 at the suggestion of a federal judge in New York whom Hon. Jose Antonio Fuste had asked to help recruit a court reporter to serve as the official reporter for his session, in which a five-month trial of complex litigation known as the U.S.I. Properties case was about to begin. Judge Fuste and Jones agreed to and fulfilled a one-year commitment. Defendant Pineda was appointed official reporter by Judge Acosta soon after the judge entered on duty in 1982 and has served continuously in that capacity. Pineda had been the reporter for the session of Judge Pesquera, whom Judge Acosta succeeded.

The Dupont Plaza litigation arose out of a conflagration at a Puerto Rico hotel in which nearly 100 lives were lost, resulting in a multiplicity of large claims for damages by 2,337 plaintiffs against many defendants on various theories of liability. The case was drawn to Judge Acosta, who presided at numerous pretrial conferences and hearings and, for purposes of trial management, subdivided the trial into various phases. Trial commenced in March, 1989. The last final judgment has not yet been entered. Pretrial hearings were held in the former federal courthouse in Old San Juan. However, the facilities there were inadequate to accommodate the crowds of litigants, attorneys and witnesses; so the mezzanine of the Citibank Building in Hato Rey was converted to a courtroom and related quarters. The Dupont trial started there and phases I and II were completed there. While phase III was in progress, the federal courthouse in Hato Rey was opened and the trial moved to the new building. Phase I began on March 15, 1989 and ended on May 12, 1989. Phase II began on June 27, 1989. Daily copy of the Dupont litigation, i.e., a transcript of the previous day's proceedings, was marketed by the defendants under an arrangement with a private office established by the Court for that and other purposes called the Joint Document Depository, of which a Ms. Foulds was the administrator. This office relieved the defendant of the burden of ever dealing directly with the attorneys and others desiring copies, by making copies of the transcript received from Pineda at the end of each trial day and distributing them to persons who had ordered them from Ms. Foulds. The Depository paid Pineda on a weekly basis, issuing seven checks from March 29 to May 18, 1989 for phase I transcripts totalling $112,082.75. Subsequent Depository checks payable to him previous to the trial of the

---

stantive law, all of whom assumed that the parties' contract was governed by the law of Puerto Rico, where it was entered into, partially performed and allegedly breached.

**2.** Defendant also filed excerpts from plaintiff's testimony as to damages and the full transcript of Judge Acosta's testimony. Otherwise the

court has relied on its recollection of the evidence, aided by its notes and those of its law clerk.

**3.** Henceforth, for simplicity we shall refer to the parties in the singular, meaning the respective husband court reporter, unless otherwise indicated.

instant case totalled $353,704.00, for a grand total of $465,787.75.

Computerized stenotyping, as practiced by the parties, is a far cry from the traditional, sometimes hand-crippling method of court reporting in which court reporters recorded testimony in shorthand and returned to their offices to type up their notes. In recent years, stenotype machines have been designed whose product can be fed into, or "dumped", into a computer with an attached printer which automatically translates the stenotyped characters or symbols into intelligible language. A change in the method of dumping employed by Jones and Pineda in the Dupont litigation turned out to be relevant to their dispute, as follows: during the pre-trial hearings and phase I, Jones and Pineda alternated every half hour or so and brought the tapes from the courtroom to the room in which the computer-printer was located and dumped them into the computer manually. At some time before the end of phase I, the parties conceived a way of avoiding the dumping process by running a telephonic or similar cable, with appropriate capacity and booster circuits, directly from the stenotype machines in the courtroom to the computer. This improvement would expedite preparation of transcripts by eliminating the time consuming dumping process. In addition, plaintiff contends, it enabled the defendant to dispense with plaintiff's services and motivated his breaching their contract.

Court reporting of federal trials is governed by statute, a Court Reporters' Manual promulgated by the Administrative Office of United States Courts ("AO") and plans adopted by court order. Title 28 U.S.C. § 753(b) provides in relevant part,

(b) Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim by shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge.

The AO Manual defines seven categories of court reporters, the first of which describes defendant Pineda:

1. *Official Staff Reporters.*

These reporters are official, salaried employees of the court appointed by the court for an indefinite term pursuant to the authority of the Judicial Conference.

The seventh category is:

7. *Substitute Reporters.*

These reporters are employees of an official staff, additional, temporary, or combined position court reporter and are paid by the employing court reporter. An oath must be administered to all substitute reporters [4].

A Plan for the Effective Utilization of Court Reporters was adopted in 1983 by the United States Court for the District of Puerto Rico and contains the following provision regarding daily copy:

7. *Production of Daily Transcript*

Production of daily or hourly transcript is not to be subsidized by the Court. A court reporter receiving a request for daily copy shall immediately notify the Clerk of the Court. If extra reporters are required to provide such transcript, the cost of such reporters shall be paid by the official reporter out of the earnings derived from the higher (for daily copy) transcript rates as established by the Judicial Conference.

### Motion for Judgment

■■■ Defendant's motion for judgment as a matter of law is a renewal of defense motions heard during and at the conclusion of the evidence at the trial. The grounds now urged by the defendant were all submitted previously. *Cf. Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.,* 583 F.2d 565, 568 (1st Cir.1978). By amendment effective December 1, 1991 the terminology of Rule 50(b), Fed.R.Civ.P., was

---

**4.** No oath as a substitute reporter or any other oath was administered to plaintiff in connection with the Dupont fire litigation. Hence Jones might also, perhaps more accurately, be described as an extra or relief reporter. By whatever description, he was an employee, subject to Pineda's control.

changed; but the well-established legal standard for deciding motions formerly called motions for judgment notwithstanding the verdict remains the same, as follows:

Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure:* § 2524 (1971), at 545–6, quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970). The court must view the evidence most favorably to the verdict winner, here the plaintiff, against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence. *Chedd–Angier Production v. Omni Publications, Int.,* 756 F.2d 930, 934 (1st Cir.1985). The decisive question is, could a reasonable jury, properly instructed in the law,[5] have arrived at the conclusion actually reached? *See Insurance Co. of North America v. Musa,* 785 F.2d 370, 372 (1st Cir.1986). The Court may grant a judgment as a matter of law only if it finds that the evidence could lead a reasonable person to only one conclusion. *Hendricks & Assocs., Inc. v. Daewoo Corp.,* 923 F.2d 209, 214 (1st Cir.1991); *Gallagher v. Wilton Enterprises, Inc.,* 962 F.2d 120, 124 (1st Cir. 1992).

The facts recited in the introductory portion of this memorandum are undisputed background for the issues contested at trial. A number of further undisputed facts follow, set, however, in the context of disputed testimony received at the trial. The dominant undisputed facts are that the parties entered into a contractual relationship which was not memorialized by any writing and "was for the entire length of the *Du-*

*pont* trial" (quoting the parties' stipulation filed May 29, 1990). The central issue at the trial was the terms and conditions of such contractual relationship. More specifically, could the jury have found reasonably that the parties intended that defendant would be obligated to pay the plaintiff half of the compensation received by the defendant for transcribing the *Dupont* fire litigation even after plaintiff was in effect barred from the courtroom by the presiding judge? Because of events related to the formation and termination of the contract[6], we answer in the affirmative. In our opinion, the jury found reasonably that, in exchange for plaintiff's promise to stay, the defendant promised to employ plaintiff for the duration of the *Dupont* trial and to divide equally the compensation he received; and further found reasonably that defendant's obligation to pay was not conditioned on Judge Acosta's continuing approval of plaintiff's participation and, alternatively, that defendant knowingly assumed the risk that Judge Accosta would not approve plaintiff's participation after phase I, a development foreseeable by defendant in the light of the following circumstances.

Plaintiff was employed only by the defendant. Even at trial Judge Acosta had not previously been told the terms of the parties' agreement or defendant's understanding of them. At the time of their agreement, which arose at some unspecified time before February, 1989 (evidence throughout the trial as to dates and chronology was uniformly imprecise), defendant needed the assistance of an experienced court reporter. Counsel in the Dupont litigation had ordered daily copy and it was defendant's responsibility to produce it. Defendant tried to enlist the collaboration of reporters other than plaintiff, but without success. When plaintiff heard

---

5. Defendant made no objections to the court's instructions.

6. Puerto Rico law provides that "[a] contract exists from the moment one or more persons consent to bind himself or themselves, with regard to another or others, to give something or to render some service." Article 1206 of the

Puerto Rico Civil Code, 31 L.P.R.A. § 3371 (1991). Article 1234 provides, "*Determination of intention.* In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." 31 L.P.R.A. § 3472 (1991).

about this, he offered his services. Defendant accepted on two conditions: first, plaintiff must promise to stay in Puerto Rico for all phases of the Dupont trial until its conclusion. Plaintiff did so promise. Secondly, because defendant felt that plaintiff's leaving Judge Fuste's session after only a year might indicate dissatisfaction on the part of Judge Fuste with plaintiff's performance and also because Judge Acosta had been critical of some of Jones' reporting of pretrial conferences, Pineda also required that Jones obtain a letter of recommendation from Judge Fuste attesting to his satisfaction with plaintiff's ability and performance. Plaintiff obtained such a letter.[7] Defendant then spoke to Judge Acosta, whose direct testimony on this point was as follows:

> "... Then Mr. Pineda as I recall requested utilizing the services of Mr. Jones as a substitute court reporter for the Dupont case. I recall mentioning some misgivings because of the fact that doing [sic] the hearings and proceedings—anyway I had my doubts because I knew this was complex and it was going be [sic] a lengthy case; but with the assurances of Mr. Pineda that he was going to work out, I told him it was all right to take him on for the Phase One portion of the trial." [8]

Pineda then agreed with Jones to employ him for the entire length of the trial. However, Pineda did not disclose to plaintiff the limitation imposed by Judge Acosta,[9] viz., that Jones could be employed "for the Phase One portion of the trial". Also, at no time did Pineda inform the judge that he had hired Jones for the entire length of the Dupont trial. The reporters also agreed to divide the work equally, rotating every half

hour, and to merge the transcriptions for each day's proceedings; and, after deducting joint expenses, to divide the compensation from the Joint Document Depository 50–50.

Phase I lasted nine weeks, beginning on March 15, 1989 and ending on May 12, when the parties agreed to settle the issues framed for that segment of the trial. Jones and Pineda and their wives collaborated effectively, splitting the Pineda's compensation equally, after expenses had been deducted. For his work on phase I, defendant paid Jones $49,108, approximately $1,500 per session. After the wives did the scoping of their husband's work, Pineda always did the final proof-reading of the joint product. Jones performed capably, although Pineda felt that Jones slowed him down and told Judge Acosta that he was not happy with Jones and was having problems with him; but he did not tell the judge the nature of the problems.

Phase II commenced on Wednesday, June 27, 1989, with the selection of a jury. Three days later, on June 30, Pineda discharged Jones. On the day before, June 29, they had installed the cable directly from the machines in the courtroom to the computer-printer, thereby enabling Pineda to supply daily copy without the collaboration of a substitute or extra court reporter. Plaintiff's testimony at the trial supported his claim that defendant, rather than Judge Acosta, was responsible for his discharge.[10] True, the judge approved termination of plaintiff's participation, but not on the basis of an evaluation of plaintiff's performance in reporting the trial proceedings except by way of defendant's reports to him.

---

**7.** At the trial, Judge Fuste was called as a witness by plaintiff and testified about plaintiff's performance in his session, describing him as dedicated, efficient, never late or disrespectful and a good team player. He never heard a complaint from anyone about the plaintiff.

**8.** In response to a follow-up question by the court whether he said anything to Pineda about the trial beyond the first phase, Judge Acosta responded, "Well, Judge, that's hard to say" and described his state of mind at the time, not any further statements to the defendant.

**9.** We can recall no explicit testimony on this point; but if there was not, such an inference is irresistible.

**10.** In the course of telling plaintiff that he was through, defendant told him that he had made too many errors on June 28th, that he slowed defendant down, that plaintiff's discharge was all defendant's doing. Plaintiff testified that the defendant answered negatively his direct question, "Would the judge object to my working?"

Judge Acosta was in no position to appraise the accuracy of plaintiff's work at trial because the reporters jointly produced a single, merged transcript. The situation was different pretrial, when the reporters worked separately. Then the judge was dissatisfied with some of plaintiff's reporting and directed Pineda not to use Jones for reporting pre-trial conferences. The judge felt uncomfortable with plaintiff, who at times would stop attorneys, couldn't get Spanish names properly, missed some of the testimony, needed to have it repeated and did this in an agitated way. Pineda knew the judge's feelings. Thus, when defendant told the judge that his arrangement with plaintiff was not working out satisfactorily, Judge Acosta readily revoked his prior approval of Jones' participation.

■ In essence, the parties' agreement was a bilateral employment contract for the unpredictable duration of the *Dupont* trial, with plaintiff's compensation made dependent upon the defendant's. *See* 1 Samuel Williston, *Williston on Contracts* § 1:17 (Richard A. Lord ed. 1990); Article 1214 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3401 (1991); *Teachers Annuity v. Conjugal Partnership*, 115 D.P.R. 277 (1984). On the collateral issue of the adequacy of plaintiff's performance, it was the gist of plaintiff's testimony that, in order to justify firing him, defendant made mountains of molehills, i.e., exaggerated the frequency and significance of reporting errors. Defendant testified about shortcomings in plaintiff's performance, but his principal line of defense was clearly the withdrawal of Judge Acosta's approval. In our opinion, there was ample evidence on which reasonable jurors found that plaintiff fulfilled his part of the bargain and that defendant did not.

With respect to the legal significance of the withdrawal of Judge Acosta's approval, it should be noted first that his actions were entirely discretionary and authorized by relevant statutes and regulations. A key question put to the jury was whether the agreement between the parties was conditional upon the judge's continuing approval of plaintiff's participation. In our opinion, the jury's verdict on liability was a reasonable negative answer.

Defendant's brief in support of his motion for judgment argues that the judge's barring plaintiff created a condition making the parties' performance impossible and, under Article 1069 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3044 (1991), annulled the obligations of both parties under their contract, citing *Rodriguez v. Municipality*, 75 P.R.R. 449, 463; 75 D.P.R. 479, 490–95 (1953) in which the Court stated the local law as follows:

> "[i]n a mutual obligation, where there has been a partial fulfillment of the obligation, where without the promisor's fault a series of circumstances supervened which render impossible the total performance of the obligation, the promisor is released from performing that part of the contract whose fullfillment has become impossible, and *unless the promisor has clearly assumed the risk of unforeseen events, of which he could have been fully aware at the time he signed the contract,* he is entitled to recover back any services rendered, and any material and labor furnished up to the very moment when the impossibility of the final performance of the obligation supervened;" (emphasis added).

We read the *Rodriguez* case differently. First, if the defendant knowingly brought about the supervening circumstance which rendered total performance impossible, *viz.*, the withholding of Judge Acosta's approval of plaintiff's participation, he would not be without fault. Secondly, the "unless" clause would seem to describe the situation in the instant case. Pineda was the only staff reporter assigned to Judge Acosta's session since the judge took office in 1982. At the time Pineda hired Jones, he knew of the judge's reservations about Jones and that the judge might withhold renewed approval of Jones as a substitute or extra court reporter if this could be done without interfering with the progress of the Dupont trial. In the words of *Rodriguez*, defendant clearly assumed that risk.

Defendant's motion for judgment as a matter of law is denied.

### Motion for New Trial

 Defendant has moved for a new trial on three grounds: (a) the verdict was against the weight of the evidence, (b) damages awarded by the jury were clearly excessive and bear no relationship to the evidence, and (c) defendant was prejudiced by the exclusion of certain evidence.[11] The standard as to ground (a) is that the moving party must show that the verdict is "against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 599 (1st Cir.1987) or against "the great weight of the evidence", *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir.1988). "In considering a new trial motion, the court *may* weigh the evidence and assess the credibility of witnesses." *Insurance Co. of North America v. Musa*, 785 F.2d 370, 375 (1st Cir.1986) (emphasis in original). The Court may not set aside a verdict merely because it disagrees or because it would have reached a contrary result. *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944).

 Our discussion *ante* sets forth much of the evidence supporting the jury's finding of liability. There were fewer disputes as to the facts than disputes as to the inferences to be drawn from undisputed facts. For example, the AO guidelines describing the judge's discretion were undisputed, but the impact of those guidelines on the parties' agreement was at the heart of the parties' dispute. For another, the proximity of the timing of Jones' dismissal to the installation of the long computer cable was not at issue. The question was whether the jury might reasonably infer a causal or motivating connection between the two events. *Cf. Biggins v. The Hazen Paper Co.*, 953 F.2d 1405, 1416 (1st Cir. 1992), cert. denied, —— U.S. ——, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992), and cert. granted, —— U.S. ——, 112 S.Ct. 3035, 120 L.Ed.2d 904 (1992). Moreover, an important segment of Jones' testimony on direct, viz., that Pineda told him that he, not the judge, was responsible for plaintiff's discharge, was not contradicted by Pineda during his own testimony.[12] Finally, an attitude of dignity and righteousness characterized plaintiff's testimony and he came across as a credible witness. Pineda was no less truthful, in our opinion, but not as credible, perhaps because of the aforementioned gap in his testimony, his emphasis on Judge Acosta's role rather than on the terms of his own bargain with Jones and his never having informed Judge Acosta of the terms of his agreement with Jones. In sum, the verdict on liability, while by no means inevitable, was not against the clear or great weight of the evidence; nor is an entire new trial required in order to prevent injustice.

### Damages

Damages are a different story. The relevant, well settled measure is plaintiff's loss of prospective compensation, modified by the doctrine of avoidable consequences, as follows:

> The plaintiff's right is to recover such damages as the defendant's wrong necessarily caused him. It is usually said that the plaintiff is under a duty to mitigate damages. However, the truth seems rather to be that damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and, therefore, are not to be charged against him.

**11.** We deny the motion on ground (c) summarily. The record of the proceedings will have to speak for itself. Generally speaking, the Court noted lack of proper foundation and irrelevancy and was relying too on Rule 403, Fed.R.Evid. Reconsideration now of those rulings is made difficult, if not impossible, by defendant's having omitted, to the best of our recollection, to make offers of proof.

**12.** Pineda testified fully regarding his dissatisfaction with Jones' performance; but did not disavow his agreement to employ Jones for the entire length of the *Dupont* trial.

11 Samuel Williston on Contracts, (Walter H.E. Jaeger ed. 3rd ed. 1968), § 1352; 22 Am.Jur.2d, *Damages* § 516 (1981). In the instant case, therefore, plaintiff's loss was the difference between what defendant had promised to pay him and what he could have earned elsewhere with reasonable effort.

■ Damages awarded to plaintiff by the jury were clearly excessive, so much so as to require a new trial on damages, unless a remittitur would be appropriate and acceptable to plaintiff; so excessive too as to raise the threshold question whether indicative of juror prejudice infecting the finding on liability. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2815, at 103 (1973). The threshold question we answer negatively for the following reasons: (a) the jury's verdict as to liability was consistent with and supported by the evidence; (b) liability and damages issues were not inextricably interwoven at the trial [13]. *See Great Coastal Exp., Inc. v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 511 F.2d 839, 847 (4th Cir. 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976); on the contrary, damages were litigated distinctly and almost separately, focusing on plaintiff's obligation to mitigate them; (c) while plaintiff's trial counsel erred in analyzing damages, she made no improper appeals to passion or prejudice. *See Gorsalitz v. Olin Mathieson Chem. Corp.,* 429 F.2d 1033, 1043 (5th Cir.1970); (d) this was not a case, generally speaking, in which passions ran high. *See Wagenmann v. Adams,* 829 F.2d 196, 216–18 (1st Cir.1987); counsel were courteous and professional at all times, and accommodated conflicting commitments of witnesses for both sides; (e) excessiveness of the damage award is explainable not by passion or juror prejudice but by the parties' casual treatment of the evidence pertaining to damages. This factor calls for elaboration, in separate paragraphs, which follow.

■ The key evidence on damages was plaintiff's exhibit 2 showing the dates, check numbers and amounts of weekly checks issued to Pineda by the Joint Document Depository. The checks covered both compensation per page of transcript and reimbursement of expenses. For phase I, seven checks totalled $112,083. For reporting and expenses thereafter, 55 checks were issued, the first on July 6, 1989 and the last on December 5, 1991, totalling $353,704. Based on the evidence [14], a fair approximation of defendant's expenses after phase I, to be deducted before the contemplated 50–50 division between Pineda and Jones would be $15,000. Thus the plaintiff's *prima facie* loss attributable to his discharge was $170,000 ($353,705 − $15,000 ÷ 2). That figure was also the maximum award consistent with any plausible theory of the evidence.[15] How, then, did the jurors arrive at their award of $225,000? It seems highly probable that their process of analysis started with the wrong figure, $465,787 instead of $353,705. Plaintiff's counsel began her closing argument by writing the larger figure, along with two others [16], on the blackboard-like easel, and proceeded forthwith to argue forcefully the issues of fairness and credibility warranting an equal division of Pineda's compensation for the entire Dupont trial proceedings. Defense counsel left the

---

**13.** This factor, while relevant, is more significant in cases in which damages are clearly inadequate, indicating a jury compromise or trade-off as to damages reflecting a compromise on liability. *See Caskey v. Village of Wayland,* 375 F.2d 1004 (2d Cir.1967). *See 6A Moore's Federal Practice.* ¶ 59.06 at 59–59 (2d ed. 1974).

**14.** Witness Tyrone Johnson, a school teacher friend, became Pineda's self-described "go-fer" assistant after plaintiff's departure, earning $50–60 per day for a total he estimated at $8,000–$9,000. Witness Sanchez Conception also performed messenger and similar duties for defen-

dant after phase I. The defendant also paid for miscellaneous supplies such as tapes and paper.

**15.** Plaintiff and his wife both estimated greater lost earnings, plaintiff testifying to $250,000–$300,000 and Mrs. Jones testifying to $200,000–225,000. However, these estimates were pure speculation, unsupported by any other evidence.

**16.** The entire writing was:

$465,787.75
− 49,108.00
$366,679.75

$465,787 figure on the easel without subtracting from it or arguing its misleading implication or correcting an obvious error in subtraction. Moreover, both parties paid scant attention to exhibit 2 during the presentation of testimony. At no time before the verdict did either party propose or rebut the simple analysis outlined *ante* toward establishing a damages ceiling of $170,000. The likelihood of the jury's having used the blackboard figure as a starting point is readily demonstrable. *Cf. Big John, B.V. v. Indian Head Grain Co.,* 718 F.2d 143, 150 (5th Cir.1983) $465,787 − $15,000 ÷ 2 = $225,394, rounded off to $225,000.

■ Similar deficiencies seem to have led to an apparent omission by the jury to reduce its award by sums earned by plaintiff after his discharge on June 30, 1989, and before the end of the Dupont trial in December, 1991. The law regarding mitigation of damages is well established: the measure of damages sustained by reason of failure on the part of an employer to comply with a contract for services is, prima facie, the compensation stipulated in the contract, subject to reduction upon proof by the defendant as to the amount the employee did gain or could have gained during the time the contract was to remain in force. *Hardouin v. Krajewski Pesant Company,* 22 P.R.R. 641 (1915); *Ex Parte Garcia,* 44 P.R.R. 286, 295 (1932). Unfortunately, the evidence on this issue was quite sketchy. Defendant never took plaintiff's deposition on the subject and never subpoenaed or notified plaintiff to bring with him his accounting or other financial records to the trial. As a result, cross-examination on the subject began as follows:

Q Do you recall, can you tell us, how much money you earned between June 30, 1989, and December 31, 1989?

A Offhand I couldn't tell you. Offhand I couldn't tell you.

Q Could you tell us an approximation?

A I could get records but offhand I couldn't, you know, tell you.

Q You don't recall?

A No, I don't. I prefer, you know, rather than give you an incorrect statement to give you the answer "I don't recall."

When directed by the Court to give his best estimates, plaintiff described his sole ownership of a stenographic reporting business in Albany, New York, Stenotype Systems, Inc., which worked for the New York State Assembly, parties to court proceedings and other clients. Noting frequently that "I'm speaking from the top of my head" and "Again I'm guessing", Jones testified that he drew a salary from the corporation of $14,000 in 1990 and under $7,000 in 1991.[17] When further ordered by the Court to state the gross and net earnings of the corporation for those years, plaintiff protested that he had records he could obtain which would enable him to give accurate answers. He did, however, respond by what he called "a guesstimate", with considerable confusion regarding the years of receipt of income and whether gross or net. A reasonable conclusion from this testimony would be that the gross income of the corporation was at least approximately $50,000 in 1990 and $40,000 in 1991. The jury's failure to reduce damages on the basis of the income of the plaintiff and his wholly owned corporation would be error; but again, as with the mistaken analysis of Pineda's receipts after phase I, such an error would be chargeable to the parties' lack of preparation on the issue, and would be of only marginal relevance to the jury's determination of liability.

### *Remittitur*

We have already seen that the jury's award of damages cannot stand, both because grossly excessive and, since this is a case involving only economic loss, unsupported by the evidence. *Kolb v. Goldring, Inc.,* 694 F.2d 869, 871 (1st Cir.1982). A new trial will be ordered, at least conditionally, but it will be confined to damages

---

**17.** The six-month period in 1989 following plaintiff's discharge on June 30, 1989 was not inquired about.

under general principles explicated in *Great Coastal Express, Inc. v. Int'l. Brhd. of Teamsters*, 511 F.2d 839, 845–48 (4th Cir.1975), *cert. denied* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976) as follows:

> Turning now to the issue of whether a partial new trial was appropriate, we note that such is expressly permitted by F.R.Civ.P. 59(a). The principal case with respect to ordering a new trial as to damages only is *Gasoline Products Co. v. Champlin Co.*, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). The court, in *Gasoline Products*, held "that, here the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again." 283 U.S. at 499, 51 S.Ct. at 515....
>
> The matter of a partial new trial has been frequently considered since *Gasoline Products* and its subsequent articulation in F.R.Civ.P. 59(a), and one of the leading texts states that it "may be regarded as settled that if an error at the trial requires a new trial on one issue, but this issue is separate from the other issue in the case and the error did not affect the determination of the other issues, the scope of the new trial may be limited to the single issue." 11 Wright & Miller, Federal Practice and Procedure, Civil (1973), p. 93; see also Moore's Federal Practice, 2nd Ed., 1974, ¶ 59.06.

As in that case, in this one too "there is no substantial indication that the liability and damage issues are inextricably interwoven, or that the first jury verdict was the result of a compromise of the liability and damage questions". *Id.* at 846. *See also Dopp v. HTP Corp.*, 947 F.2d 506, 518–19 (1st Cir.1991). Cf. *Kropp v. Ziebarth*, 601 F.2d 1348, 1355 n. 15 (8th Cir.1979).

**18.** As noted *ante,* plaintiffs' estimates of greater losses were purely speculative and, for present purposes, are disregarded.

**19.** The history of the problem and the divergence of judicial and scholarly opinion are discussed at *6A James W. Moore's Federal Practice,*

 Whether avoidance of a retrial on damages by way of remittitur would be appropriate depends on the particular situation presented. The Court's analysis of Exhibit 2, *ante,* indicating that the jury's award was grossly excessive also showed, on the other side of the coin, that plaintiff's loss, subject to the doctrine of avoidable consequences, was $170,000.[18] Hence a remittitur of $55,000 would be required (the verdict of $225,000 minus plaintiff's loss). But this would be only the first step in remitting the excess found by the jury, since it was equally shown that plaintiff had substantial earning power as a court reporter in New York between June 30, 1989 and December 5, 1991 whereby plaintiff could, and in fact did, reduce the loss attributable to his discharge by Pineda. Whether the evidence at trial supports a remittitur computation compatible with applicable principles of law of an amount of mitigation fair to both parties, we next address.

 The initial relevant rule is that when it comes to the issue of mitigation of damages, the burden of proof shifts to the defendant. *Detroit Graphite Co. v. Hoover,* 41 F.2d 490, 494 (1st Cir.1930), *Glazer v. Glazer,* 374 F.2d 390, 413 (5th Cir.1967), *cert. denied* 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967). This shift changes the proper perspective for computing the extent to which *prima facie* damages of $170,000 would be excessive. In calculating a remittitur in the usual case, e.g., *Liberty Mut. Ins. Co. v. Continental Casualty Co.,* 771 F.2d 579, 588 (1st Cir.1985) and *Catullo v. Metzner,* 834 F.2d 1075, 1083 (1st Cir.1987), the starting point is to judge the damages proved by the plaintiff, either maximum or minimum or somewhere in between, depending on one's view of the impact of the Seventh Amendment, fairness to the defendant who has no choice in the matter, judicial economy and other considerations.[19] In our view, the Court of

¶ 59.08 (2d ed. 1991) [7] at 192–6 and *11 Charles A. Wright & Arthur Miller, Federal Practice Procedure: Civil,* § 2815 at 104–5; and are the subject of a law review article, Irene D. Sann, *Remittiturs (and Additurs) In The Federal Courts: An Evaluation With Suggested Alterna-*

Appeals for the First Circuit, in *Liberty Mut. Ins. Co.* and *Catullo, supra,* has adopted the maximum amount standard, at least in cases for breach of contract. The corollary of this standard on remittitur issues as to which the defendant has the burden of proof, here mitigation of plaintiff's damages, is the minimum mitigation proved by the defendant, i.e., the "irreducible minimum of the extent to which the plaintiff's damages were mitigated." *McAleer v. McNally Pittsburg Mfg. Co.,* 329 F.2d 273, 277 (3d Cir.1964).

In the instant case, a fair estimate of the amount of damages plaintiff might have avoided with reasonable effort must focus on evidence of his earning capacity as a court reporter,[20] not simply of his earnings during the 29–month period in question. Also, to arrive at an "irreducible minimum," it should be based on evidence "which was practically not disputed." *Koenigsberger v. Richmond Silver Mining Co.,* 158 U.S. 41, 53, 15 S.Ct. 751, 756, 39 L.Ed. 889 (1895), quoted in *Durant v. Sur. Homes Corp.,* 582 F.2d 1081, 1087 (7th Cir.1978). In this case, such evidence appears in the testimony of plaintiff and witnesses called on his behalf. It was undisputed that Jones is a highly skilled court reporter of many years' experience in the state capitol of New York state. He was a member of the National Court Reporters Association and owned sophisticated, costly computer printing equipment. The value of a skilled court reporter's service is indicated, if somewhat exaggerated, by his having earned approximately $1,500 per session for his work on the *Dupont* hotel litigation. True, in giving a "guesstimate" of his earnings and those of Stenotype Systems, Inc., Jones protested that, lacking financial records at trial that he could have

produced on reasonable notice, he was "trying to speak from the top of my head." However, substantial earning capacity was implied by his remark, "I was too expensive for the business." In this connection, the annual salary figures plaintiff testified as having been received from his corporation did not reflect his total earnings as a court reporter for those years. Plaintiff's most direct testimony on this point was in response to a question, "Now, from January 1, 1991 through November 1, 1991, what was your income from court reporting sources?", to which he replied, repeatedly citing the regrettable absence of accurate records, "1991, probably 40" (meaning $40,000).

In sum, the excerpts from plaintiff's testimony on cross examination, filed by the defendants with their motions, support a finding that plaintiff's net earning capacity during the period in question was no less than half what he would have earned had Pineda not discharged him, to wit, $85,000, comprising $15,000 for the latter half of 1989, when plaintiff needed to relocate and adjust to jibes such as that from the president-elect of the national association, "I heard you've been chased out of Puerto Rico" and $35,000 for 1990 and 1991. Accordingly, plaintiffs may elect to remit $140,000 of the $225,000 verdict returned by the jury, in which event judgment will enter for the plaintiffs in the sum of $85,-000 and costs.[21]

### *Orders* *

1) The Motion For Judgment as a Matter of Law filed by defendants The Conjugal Partnership Comprised by Arthur Pineda and Toni Pineda is denied.

2) The alternative Motion for a New Trial filed by said defendants is allowed to the

---

*tives,* 38 Case W.Res.L.Rev. 157 (1987–88) and a note *Remittitur Practice In The Federal Courts,* 76 Colum.L.Rev. 299 (1976).

**20.** Plaintiff's earning capacity as an entrepreneur of Stenotype Systems, Inc. is to be distinguished except insofar as he testified that his personal income as a reporter and corporate owner would be "one in the same."

**21.** Prejudgment interest is not ordered because defendants have not defended with temerity.

See Court's denial of plaintiffs' motion for attorneys' fees dated March 17, 1992.

* The clerk shall forthwith set forth these orders on a separate document pursuant to Rule 58, Fed.R.Civ.P., and serve it and this memorandum of decision on the parties. Also, if plaintiffs file such written consent on or before July 14, 1992, the clerk shall enter final judgment in the sum of $85,000 and costs.

following limited extent: unless plaintiffs Conjugal Partnership Comprised by Joseph Jones and Vernetta G. Jones, H/N/C Stenograph Systems consent in writing filed on or before July 14, 1992 to remit $140,000 of the verdict returned by the jury so that judgment for the plaintiffs in the sum of $85,000 and costs may be entered, a new trial limited to the question of damages will be scheduled.

3) Judgment entered December 20, 1991 on the jury verdict is vacated.

4) Stay of execution entered March 17, 1992 is ordered continued until further order of the Court.

